**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**


| | | |
|---|---|---|
| BARCLIFF, LLC, d/b/a RADCLIFF/ ECONOMY MARINE SERVICES, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | | CA 14-0590-C |
| | : | (ADMIRALTY) |
| M/V DEEP BLUE, IMO NO. 9215359, her engines, apparel, furniture, equipment, appurtenances, tackle, etc., *in rem,* | : | |
| | : | |
| Defendant. | | |


## MEMORANDUM OPINION AND ORDER

This matter came on for a bench trial before the undersigned on June 22-23, 2016.

Upon consideration of the agreed facts set forth by the parties in their revised final

pretrial document (Doc. 79, at 2-4), the testimony offered by the witnesses during the

bench trial, the exhibits admitted without objection (*see* T.T. 4-5), and the declarations of

English barristers admitted without objection and directed to the scope of the rights

assigned to ING under the English Omnibus Security Agreement ("Security

Agreement") dated December 19, 2013 (*see* T.T. 107-108), this memorandum opinion

and order is entered pursuant to 28 U.S.C. § 636(c), Fed.R.Civ.P. 73, and S.D. Ala.

GenLR 73(c).

## FINDINGS OF FACT

On October 21, 2014, the Chief Engineer of the M/V DEEP BLUE,[1] Ian Ladyka, emailed a bunker stem request to Technip's EPC Helpdesk,[2] which advised the help desk of the quantity and type of fuel the vessel needed, the location (that is, port) for delivery of the fuel stem, and the approximate date the vessel would be in the designated port for delivery of the fuel. (*Compare* Technip's Trial Exhibits 11-13 *with* T.T. 114, 118 & 122.) The request to the EPC Helpdesk generated an automatic email reply to the vessel's Chief Engineer that his request had been registered. (*See id.*) As well, the request was converted by the Helpdesk (on October 22, 2014) into a Request for Quotation and sent to the three fuel suppliers with whom Technip had a historical relationship, that is, A/S Dan Bunkering, World Fuel Services, and OW Bunkers UK Ltd., with notification being sent to the DEEP BLUE's Chief Engineer of the invitees being asked for quotation (*compare* T.T. 113-115 & 122 *with* Technip's Trial Exhibits 11, 14 & 15). Once Technip's procurement tool—the EPC Helpdesk/team—received the bids from the three solicited suppliers on October 23, 2014, the EPC team awarded the nomination for the fuel stem to OW Bunkers UK Ltd. ("OW Bunkers UK") based upon its quotation of the lowest price per metric ton, agreeing to purchase the fuel from OW Bunkers UK,[3] and notified Chief Engineer Ladyka that the quote from OW Bunkers UK

---

[1]    Technip is the owner of the M/V DEEP BLUE, a pipe-laying vessel. (T.T. 15.) Technip owns a facility in Theodore, Alabama that constructs the pipe and spools it onto the DEEP BLUE. (*See id.*)

[2]    EPC is Technip's procurement tool and is utilized to solicit and receive overseas bids related to the fueling of vessels owned and operated by Technip. (T.T. 110.)

[3]    The buyers of fuel for Technip's fleet of vessels worldwide in October and November of 2014 were located in Aberdeen, Scotland and reported directly to Janice Hughes, Technip's Supply Chain Lead since December of 2013. (T.T. 111-112.) These fuel buyers procured fuel for all Technip vessels, including the DEEP BLUE, using Technip's Fuel Request (Continued)

was accepted by the EPC team on behalf of the DEEP BLUE.[4] (T.T. 122-123; *see also* Technip's Trial Exhibits 16 & 19; Doc. 79, at 3 ("Technip . . ., the owner of the Vessel, contracted with O.W. UK for the supply of bunkers to the Vessel.").)[5]

There can be no doubt that the winning bid of OW Bunkers UK was informed by the quote supplied by Radcliff/Economy Marine Services ("Radcliff")[6] to OW Bunker USA Inc. ("OW Bunker USA") in response to the fueling inquiry (for marine gas oil) it received from OW Bunker USA[7] concerning the anticipated delivery of a fuel stem to the DEEP BLUE on November 1, 2014, as well as the similar inquiries received by the

---

Policy and Procedure. (T.T. 112; *see also* T.T. 121 (it was part of Hughes' team's responsibility to stem bunkers for the DEEP BLUE in October and November of 2014) & Technip's Trial Exhibit 11.)

[4]     As reflected by the foregoing description, the Chief Engineer of the DEEP BLUE had authority to initiate the process for procurement of fuel but did not have the authority to award or nominate the fuel stem (T.T. 118; *see* T.T. 122 (Technip's EPC team in Aberdeen, Scotland, under Hughes' supervision, had the responsibility of awarding and nominating the fuel stem); T.T. 153 (chief engineer of the DEEP BLUE was not entrusted by management for procuring or ordering fuel for the vessel or for nominating a supplier of the fuel); *cf.* T.T. 149 (Technip's representative, Janice Hughes, did not personally inform OW Bunkers UK that the chief engineer of the DEEP BLUE did not have authority to procure/buy fuel for the vessel, as she did not think that necessary)) or to contract directly with the supplier of fuel (T.T. 119; *see also* T.T. 121 (the chief engineer on the DEEP BLUE did not have the authority to contract with the supplier of the fuel stem delivered to the DEEP BLUE on November 1, 2014)).

[5]     Technip's EPC team advised A/S Dan Bunkering Ltd. and World Fuel Services that their quotations were unsuccessful. (Technip's Trial Exhibits 18 & 20.)

[6]     Radcliff is primarily a petroleum distributor that sells products (lube oils and fuels) to marine vessels (T.T. 13-14) but, as well, stores (or terminals) fuels for some of its customers (T.T. 61).

[7]     The OW Bunkers Group had approximately 55 offices worldwide and utilized software to track which of its entities—for example, whether OW Bunkers UK or OW Bunker USA—was acting as the buyer or seller for a particular transaction. (T.T. 163.) To this end, each of its various offices in the world had its own internal number; for instance, OW Bunkers UK had a prefix of "24." (*Id.*)

plaintiff from A/S Dan Bunkering and World Fuel Services,[8] given that the Sales Order Confirmation[9] sent by OW Bunkers UK to Technip reflected the physical supplier of fuel to be Radcliff and OW Bunker USA otherwise confirmed to Radcliff that it had the order. (*Compare* T.T. 16-18 & Radcliff's Trial Exhibit 1 (purchase order confirmation sent to Radcliff by OW Bunker USA on October 23, 2014) *with* Technip's Trial Exhibit 6 (sales order confirmation sent to Technip by OW Bunkers UK on October 23, 2014, reflecting the supplier to be Radcliff).) Indeed, the parties "agreed" in the final "revised" pretrial order that OW Bunkers UK "subcontracted with O.W. Bunker[] USA . . . to act as an intermediary in arranging for the physical supply of the bunkers[]" and that OW Bunker USA "subcontracted with Radcliff to physically supply the bunkers to the [v]essel[.]" (Doc. 79, at 3.)[10] For its part, Technip knew approximately one hour after its

---

[8]    "Dan-Bunkering is in Houston, Texas. . . . OW Bunker[] USA is in Houston, Texas. And World Fuel is in Miami, Florida." (T.T. 17.)

[9]    "[A] sales order is when a seller confirms to a buyer that [it] acknowledge[s] receipt of that nomination and award." (T.T. 154.)

[10]    In other words, the structure of the supply chain, as even Radcliff agrees (*see, e.g.*, T.T. 53) was, as follows: Technip UK Limited ↔ OW Bunkers UK ↔ OW Bunker USA ↔ Radcliff (T.T. 166 ("Technip, as the buyer, contracted with OW Bunker[s] UK, being the seller. And OW Bunker[s] UK went to what we call the sourcing center we have for this area, OW Bunker USA, who found the physical supplier to finally make the actual supply alongside the receiving ship."); *see also* Doc. 79, at 3 ("Technip did not contract with O.W. USA for the supplying of bunkers to the M/V DEEP BLUE.")). In this supply chain, the entities in each link had separate contracts for the purchase and sale of fuel. (T.T. 168; *see also id.* ("[There was] one contract between Technip, as buyer, and OW Bunker[s] UK, as seller. And, similar[ly], OW Bunker USA as seller and OW Bunker[s] UK as buyer. And the same was Radcliff as seller and OW Bunker USA as buyer."); *see* ING's Trial Exhibit 34 (written documentation).)

The selection of Radcliff as physical supplier was made by OW Bunker USA, without any input from OW Bunkers UK. (T.T. 166-167.)  "Our office in Houston [OW Bunker USA] was also acting as what we call a sourcing center[,] [m]eaning[] that all our offices from the rest of the world would send in their inquires to the sourcing center in Houston. . . . [T]his Houston sourcing center could get the best prices from the various physical suppliers[] . . . [and] was the one making the agreements with the physical suppliers. It was their choice." (*Id.* at 167.)

(Continued)

nomination of OW Bunkers UK as the winning bidder for the fueling of the DEEP BLUE on November 1, 2014, that is, upon its receipt of the Sales Order Confirmation[11] from OW Bunkers UK, that Radcliff was going to be the physical supplier (that is, source) of the fuel stem delivered to the DEEP BLUE (T.T. 134),[12] as it (Radcliff) had been on numerous prior occasions during the period from 2011 through 2014 (T.T. 26, 36-37 & 135; *see also* Radcliff's Trial Exhibit 6).[13] However, it is clear that Radcliff was not a contractual counterparty of Technip (*compare* T.T. 51 (Radcliff's Gordon admitted that plaintiff never contracted with Technip for the fueling of the DEEP BLUE) *with* T.T. 123-124 (Technip did not contract with Radcliff)); instead, Radcliff fueled the Deep Blue at the direction of OW Bunker USA (T.T. 35, 39 & 44-47; Radcliff's Trial Exhibits 1 (purchase order confirmation issued by OW Bunker USA to Radcliff) & 3 (Radcliff's

---

OW Bunkers UK and OW Bunker USA were individual companies that worked independently but were both "subsidiaries of the headquarters in Aalborg, Denmark." (T.T. 171.)

[11] In this document, the seller, OW Bunkers UK, acknowledged Technip's order for fuel to be delivered by barge by Radcliff (as supplier) to the DEEP BLUE in Mobile on November 1, 2014, and informed Technip that payment to it (that is, OW Bunkers UK) was due "WITHIN 30 DAYS FROM DATE OF DELIVERY UPON PRESENTATION OF INVOICE[.]" (Technip's Trial Exhibit 6.)

[12] Technip did not know before its award of the nomination to OW Bunkers UK that Radcliff was going to be the supplier of the fuel stem (T.T. 123); however, it did not come as any real surprise to Technip that someone other that OW Bunkers UK would be the actual supplier of the fuel stem (*see* T.T. 133) and Technip has never rejected or revoked a nomination with OW Bunkers UK, Dan Bunkering, or World Fuel Services because the actual physical supplier of the fuel to the DEEP BLUE in Mobile is someone other than those three entities (*id.* at 136). Still, Technip played no role in selecting Radcliff to physically supply the DEEP BLUE with fuel bunkers, did not contract with Radcliff, and did not promise to pay Radcliff for the fuel stem or the November 1, 2014 delivery. (T.T. 123 & 124.)

[13] On each of those prior occasions, either OW Bunker USA or OW Bunkers UK purchased the fuel delivered to the DEEP BLUE from Radcliff. (T.T. 36-37; *see also* T.T. 51 (Radcliff's Gordon admitted that Technip never paid Radcliff for the fueling of the DEEP BLUE).)

invoice to OW Bunker USA, dated November 1, 2014, and reflecting a total amount due and owing of $699,550.00); *see also* T.T. 8 (argument of plaintiff's counsel that Radcliff fueled the DEEP BLUE at the direction of OW Bunker USA)) and was the contractual counterparty of OW Bunker USA (T.T. 35 & 39-40 (purchase order confirmation indicated that OW Bunker USA would be purchasing fuel from Radcliff[14] and, subsequent to delivery of the fuel, Radcliff issued its invoice to OW Bunker USA); *see also* T.T. 47-48 & 60 (Steve Gordon, the General Manager for Radcliff, testified that the entity purchasing fuel from Radcliff on the occasion of the November 1, 2014 fueling of the DEEP BLUE, that is, the buyer, and Radcliff's customer, was OW Bunker USA, and that Technip did not issue a purchase order confirmation to Radcliff); T.T. 76-77 (testimony of B. Greer Radcliff, the owner of Radcliff, that the invoice Radcliff generated for the November 1, 2014 fuel supply to the DEEP BLUE was issued to OW Bunker USA because Radcliff sold the bunkers to OW Bunkers USA)), while it was OW Bunkers UK, a supplier and reseller/trader of fuel supplies (*compare* T.T. 160-161 (testimony of Claus Erik Mortensen, who worked for the OW Bunker Group for almost 33 years,[15] that the group had two main divisions, a physical supply department and a trading/reselling department, and that by 2014, the group owned ships which would travel to customers and directly supply their ships and, with respect to reselling, the reselling/trading department would buy from third parties and add to its margin or profit and then sell

---

[14]     Indeed, as part and parcel of the Purchase Order Confirmation, OW Bunker USA ensured Radcliff that it would be the entity making payment to Radcliff for its delivery of bunker fuel to the DEEP BLUE, and that it would be paying a per ton price of $823.00 for the 850 tons of fuel delivered to the DEEP BLUE. (*See* Radcliff's Trial Exhibit 1.)

[15]     As of the date of this bench trial, OW Bunker and Trading A/S in Aalborg, Denmark no longer employed Mortensen; instead, he was and is a consultant to PricewaterhouseCoopers and to ING Bank, two entities that have a borrowing agreement. (T.T. 173-174.)

to its "customers with the third party as physical supplier.") *with* T.T. 120 ("I know that OW Bunkers had access to assets that would allow them to fill the fuel stem using their own equipment. I also know that they used, on occasion, or subcontracted that service through outside sources.")),[16] who was the contractual counterparty of Technip (T.T. 125; *see also* Technip's Trial Exhibit 5 (Technip's standard purchase order,[17] dated November 3, 2014,[18] reflecting the supplier as OW Bunkers UK and the total due and owing to the supplier of $700,400.00); T.T. 154 (Technip never issued a purchase order

---

[16]     During the course of the bench trial, witnesses for the plaintiff attempted to "cast" the OW Bunker entities as brokerage houses by virtue of their lack of a physical presence in the area (here, Mobile) where fuel products were being delivered to vessels. (T.T. 16-17; *see also* T.T. 38 ("The owners either deal directly with the physical suppliers or they deal with a broker to act as a go-between the physical supplier and the shipowner when they do not have a physical presence in a particular port for the commodity that they are looking for."); *cf.* T.T. 66 & 67 ("[T]he ship does not know where to get fuel . . . in every port he's going to be in. That's what created the industry of brokers in the fuel business. So a ship is going to say I'll be wherever. Go to the broker. The broker knows those suppliers in that particular location, and he sets it up. . . . You can't sell $700,000 worth of fuel and make $850 unless it's a brokerage deal.").) However, this testimony is, simply put, "overcome" by the contrary testimony of Claus Mortensen and Janice Hughes that the OW Bunker entities were not fuel brokers (*compare* T.T. 161 & 168 (the OW Bunker entities were traders/sellers/resellers and buyers of fuel, not brokers) *with* T.T. 120 (OW Bunkers UK would subcontract the filling of fuel stems to outside sources)), Janice Hughes' additional testimony that Technip never entered into a brokerage or agency agreement with either OW Bunkers UK or OW Bunker USA nor did it agree to pay either OW Bunker entity a brokerage fee or commission for the supply of fuel to the DEEP BLUE (T.T. 127-129; *see also id.* (testimony that neither OW Bunkers UK or OW Bunker USA had authority to bind Technip as owner of the DEEP BLUE or put liens on the DEEP BLUE); *see* T.T. 44 (Radcliff's Gordon testified that he did not know if OW Bunker USA had a brokerage agreement with Technip)), and the parties' "agreements" that OW Bunkers UK subcontracted with OW Bunker USA "to act as an intermediary in arranging for the physical supply of the bunkers[]" and that OW Bunker USA "subcontracted with Radcliff to physically supply the bunkers to the [v]essel[.]" (Doc. 79, at 3.)

[17]     "The purchase order is a written agreement and contract from the buyer to the seller nominating exactly the requirements and binding terms and conditions with that purchase order." (T.T. 154.)

[18]     "The order date is listed on November 3rd because that is the date it was submitted. . . . On this occasion the delivery note was done on the 1st of November 2014, which [was] a Saturday. The bunker delivery note was passed to the team in Aberdeen on the 3rd of November 2014, a Monday. The purchase order was amended on that day, and then it went through, released to get approved by the proper budget approver." (T.T. 125 & 126.) Nowhere on the purchase order is mention made of Radcliff. (*Id.* at 126.)

to Radcliff, Radcliff never issued a sales order or invoice to Technip, and Technip never paid Radcliff);[19] *see* Doc. 79, at 3 (in the agreed facts section, OW Bunkers UK is referred to as the contractual counterparty of Technip)).

Following receipt of the Purchase Order Confirmation from OW Bunker USA, Radcliff's General Manager, Steve Gordon, corresponded via email—beginning on October 24, 2014—with the DEEP BLUE's Chief Engineer, Ian Ladyka, to coordinate delivery of the fuel stem. (*See* T.T. 20 & 22; *compare id. with* T.T. 116 (post-sale logistics regarding delivery of the fuel was the responsibility of the DEEP BLUE and Technip's port agent, GAC); Radcliff's Trial Exhibit 5 (email correspondence between Steve Gordon and the DEEP BLUE's Chief Engineer).) Gordon admitted at trial that nowhere in the email correspondence was he negotiating a contract with the Chief Engineer of the DEEP BLUE. (T.T. 43.)

A fueling barge owned by Radcliff arrived alongside the DEEP BLUE on November 1, 2014, at 6:00 a.m., at Technip's facility in Theodore, Alabama, to fuel the DEEP BLUE. (T.T. 23-24 & 27-28.)[20] The crew on Radcliff's barge passed the fueling hose to personnel on the DEEP BLUE, who attached it to the vessel connection and then disconnected the hose upon completion of fueling and passed it back to the fueling barge. (*Id.* at 28-29.)  A crewman on Radcliff's fueling barge then passed up to the DEEP BLUE's Chief Engineer a Bunker Certificate, dated November 1, 2014,[21] reflecting that

---

[19]     Technip UK was a customer of OW Bunkers UK for many years; indeed, Mortensen's review of documentation from 2008 forward reflected between 170 and 200 transactions between OW Bunkers UK and Technip UK. (T.T. 165-166.)

[20]     There is no question but that Radcliff owned the fuel delivered to the DEEP BLUE on November 1, 2014, having purchased it from Shell Chemical Company. (T.T. 27.)

[21]     As admitted by Radcliff's Gordon, and as is obvious from the facts of this case, the Bunker Certificate was issued after the order for the fuel supply was placed by OW Bunker (Continued)

850 metric tons of bunker fuel was delivered to the vessel.[22] (*Compare id.* at 29 *with* Radcliff's Trial Exhibit 2.) The Chief Engineer of the DEEP BLUE[23] signed and stamped the Bunker Certificate (with the vessel's seal),[24] thereby specifically certifying the quantity and quality of fuel received by the vessel. (T.T. 29; *see also* Radcliff's Trial Exhibit 2 ("I certify the above statements are true and the above products were received on board the vessel."); *see* T.T. 156-157 (Janice Hughes' testimony that Technip views the bunker certificate as acknowledgment of receipt of the fuel set forth in its purchase order in order to "match that with the invoice and pay the invoice.").)[25] Later that day

---

USA. (T.T. 50.) In addition, the Bunker Certificate identifies as the owner for this particular fuel supply OW Bunker USA. (*See id.* at 49.)

[22]     No one from OW Bunker USA attended the fueling (*see* T.T. 24); however, this did not deviate from the ordinary course of business Radcliff conducted with OW Bunker USA, Dan Bunkering, or World Fuels (*see* T.T. 43).

[23]     The Chief Engineer of the DEEP BLUE was the person entrusted with management of the vessel while in port in Theodore, Alabama relative to fueling of the ship and no one on Technip's Aberdeen, Scotland team operationally manages the vessel while in port being fueled. (T.T. 146.)

[24]     Radcliff was required to provide a bunker delivery note for the fuel stem because that is required by MARPOL. (T.T. 48-49; *see also* T.T. 130 (Technip's Janice Hughes testified that MARPOL requires a bunker delivery note for every fuel stem).) Moreover, an authorized vessel officer's signature on the Bunker Certificate is required by MARPOL in acknowledgement of receipt of the fuel. (*Compare* T.T. 29-30 *with* T.T. 50 & 78.) As reflected above, the DEEP BLUE's Chief Engineer, not the Master of the vessel, signed the Bunker Certificate. (T.T. 50.)

MARPOL does not require any terms and conditions of sale to be provided to the vessel (*see* T.T. 78-79; *cf.* T.T. 140-144 (Janice Hughes' testimony that the subject bunker certificate includes more language than required by MARPOL, including the language that the "'transaction is subject to Radcliff/Economy Marine Services' general terms and conditions for marine fuel sales[,]'" and the witness also testifying that she's never seen a MARPOL regulation "requiring" the "'No disclaimer stamp'" language)), and, according to Janice Hughes, the Chief Engineer of the DEEP BLUE, who signed the bunker certificate, did not have the authority to agree to any terms and conditions with Radcliff (*id.* at 131).

[25]     Steve Gordon testified that Radcliff utilizes Bunker Certificates not only because of MARPOL requirements but also to ensure that the vessel receiving the product understands, based upon Radcliff's attached "Standard Conditions of Sale," it is responsible "for the payment (Continued)

(that is, November 1, 2014), Radcliff emailed an invoice to OW Bunker USA (as buyer)

in the principal amount of $699,550 (T.T. 32 & 34-35; *see also* Radcliff's Trial Exhibit 3[26])[27]

---

of product being transferred to th[e] vessel." (T.T. 30.) More specifically, Gordon points to the following language on the lower right-hand front of the Bunker Certificate which, he asserts, incorporated those terms and conditions into the November 1, 2014 fueling of the DEEP BLUE: "THIS TRANSACTION IS SUBJECT TO RADCLIFF/ECONOMY MARINE SERVICES GENERAL TERMS AND CONDITIONS FOR MARINE FUEL SALES. . . . No disclaimer stamp of any type or form will be accepted on this bunkering certificate, nor should any such stamp be applied, if it will alter, change, or waive Radcliff/Economy Marines Services maritime lien against the vessel or waive the vessel's ultimate responsibility and liability for the debt incurred through this transaction." (*Compare* Radcliff's Trial Exhibit 2 *with* T.T. 34) On the back of the Bunker Certificate, Radcliff's Standard Conditions of Sale read, in relevant part, as follows: "If products are delivered to a vessel, Seller relies upon the credit of the vessel and will have a maritime lien against the vessel and does not waive that lien until the invoice amount is paid in full." (*See id.*) Therefore, Radcliff takes the position that the Bunker Certificate/receipt constitutes an agreement reached by the chief engineer (he signed the certificate, whereas OW Bunker USA signed nothing) at the time of the fueling, particularly in light of the fact that the bunker contract between OW Bunkers UK and Technip actually incorporates plaintiff's terms and conditions (T.T. 84-85 & 89), as follows:

> These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

(ING's Trial Exhibit 28, at ¶ L.4(a).) Moreover, Radcliff points out that Technip never affixed a "no lien" clause or stamp to the subject Bunker Certificate or any other bunker certificates signed by its personnel. (*See id.* at 86.)

According to Claus Mortensen, however, Clause L.4(a) was inserted into OW Bunker Group's Terms and Conditions of sale for Marine Bunkers "specifically for the supplies and the claims we had in the Suez Canal where we also sold fuels in general, but those governmental-owned physical suppliers [] were very strict on their own terms, especially the time-buying part in the event of claims where they both have 7 days from the date of delivery." (T.T. 185; *but cf.* T.T. 187 (witness was unable to point out where Clause L.4 was limited to a geographic region).) In addition, it was Mortensen's testimony that he never saw a situation in which "Clause L.4 operated to negate Clause I.9." (T.T. 187.)

[26]     That invoice states, in part, "TERMS Net 30 days" (*id.*), meaning that OW Bunker USA had 30 days to pay Radcliff; therefore, "in essence, Radcliff extended credit to OW USA for that 30-day period[.]" (T.T. 40.)

[27]     Radcliff also emailed a copy of the Bunker Certificate to OW Bunker USA. (T.T. 32.)

and OW Bunkers UK issued an invoice to Technip for delivery of the bunker fuel in the

principal amount of $700,400.00, representing a unit price per ton of $824.00 for the 850

metric tons of fuel delivered to the DEEP BLUE[28] (Technip's Trial Exhibit 7).[29]

Within two weeks of issuance of the foregoing invoices, OW Bunkers UK and

OW Bunker USA filed for bankruptcy (*compare* T.T. 41 *with* T.T. 169 (testimony that OW

Bunkers UK's invoice to Technip was not due until after the bankruptcy)), and neither

invoice has been paid (T.T. 35 (Radcliff's invoice in the amount of $699,550.00 has not

been paid); *see* T.T. 169-171 (OW Bunkers UK's invoice has not been paid).[30] Initially,

---

[28]     Technip never received an invoice for the November 1, 2014 fuel supply delivered to the DEEP BLUE from Radcliff or OW Bunker USA, only OW Bunkers UK. (T.T. 129-130.)

[29]     This invoice instructed Technip to make payment to OW Bunkers UK's account at ING Bank N.V. (*See id.* ("Per telegraphic transfer directly to our account without deduction of bank charges which are for buyers account.").) The invoice also provided that payment was to be made in accordance with OW Bunkers UK's General Terms and Conditions (*id.*) and the attachment to the Sales Order Confirmation issued to Technip by OW Bunkers UK clearly states that "[t]he sale and delivery of the marine fuels described above are subject to the OW Bunker Group's Terms and Conditions of sale(s) for Marine Bunkers." (*See* Technip's Trial Exhibit 6, at 2.) And much like the Standard Conditions of Sale attached by Radcliff to the Bunker Certificate and the invoice issued to OW Bunker USA, the General Terms and Conditions of Sale for Marine Bunkers utilized by OW Bunkers UK provide the following: "Where Bunkers are supplied to a Vessel, in addition to any other security, the Agreement is entered into and the Goods are supplied upon the faith and credit of the Vessel. It is agreed and acknowledged that the sale of Bunkers to the Buyer and/or their acceptance on the Vessel create a maritime lien over the Vessel for the price of the Bunkers (and all interest and costs payable in respect thereof; including but not limited to the reasonable attorney's fees), such maritime lien afforded to the Seller over the Vessel. In any event any applicable Law shall not prejudice the right of the maritime lien of the Seller afforded hereunder or by any other applicable Law, be it of the place of delivery, or the flag of the Vessel, or the place of jurisdiction and/or an arrest of the Vessel, or otherwise howsoever." (Technip's Trial Exhibit 4, at ¶ I.9.)

[30]     *See UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE, Ltd.,* 2015 A.M.C. 2070, 2071, 2015 WL 4005527 (S.D. N.Y. Jul. 1, 2015) ("On November 7, 2014, one of the world's largest suppliers of shipping fuel, O.W. Bunker & Trading A/S, and certain of its Danish subsidiaries and affiliates filed for bankruptcy in Denmark following significant risk management losses and the revelation of internal fraud. That filing set off a cascading series of other bankruptcies across the globe by other O.W. Bunker & Trading A/S subsidiaries and affiliates (together with O.W. Bunker & Trading A/S, the 'O.W. Entities') On November 13, 2014, O.W. Bunker USA, Inc., O.W. Bunker Holding North America Inc., and O.W. Bunker North America Inc. (the 'U.S. Debtors') filed voluntary petitions for Chapter 11 relief in the United States Bankruptcy Court (Continued)

when Radcliff learned of the bankruptcies, it tried to contact OW Bunker USA and, when that did not bear fruit, it contacted Technip in Houston, only to be forwarded to Technip in London. (T.T. 81.) The response Radcliff received from Technip in London was that its (Technip's) contractual counterparty was OW Bunkers UK and that it could not pay Radcliff because it would be risking double payment / exposure for the one supply of fuel. (*See id.* at 81-82; *compare id. with* Technip's Trial Exhibits 21 & 22.)

On December 19, 2014, Radcliff initiated the instant *in rem* arrest proceedings against the DEEP BLUE pursuant to the maritime procedures provided in Rule C of the Supplemental Admiralty Rules for Admiralty and Maritime Claims and Arrest Forfeiture actions. (Doc. 1.) Although Radcliff, concurrent with the filing of the complaint, also filed a motion for issuance of an arrest warrant (Doc. 2), the parties ultimately agreed—on December 23, 2014—to the substitution of a cash bond in lieu of arrest of the vessel. (*Compare* Docs. 8 & 10 *with* Docs. 6 & 7.) [31]  The cash bond paid into the registry of this Court totaled $705,529.50. (Doc. 11.)

On April 15, 2015, ING Bank N.V. ("ING Bank") filed its verified complaint in intervention and therein avers that it too holds a maritime lien for the bunker fuel delivered to the DEEP BLUE on November 1, 2014. (Doc. 20.)

John Bruce Cartwright, a chartered accountant and partner in the UK firm of PricewaterhouseCoopers (T.T. 189), became involved with the OW Bunker Group

---

for the District of Connecticut (the 'Bankruptcy Court').")," *aff'd in part & remanded sub nom. Hapag-Lloyd Aktiengesellschaft v. U.S. Oil Trading, LLC,* 814 F.3d 146 (2nd Cir. 2016).

[31]    From the outset of this action, Technip has restricted its appearance "to the defense of the <u>in rem</u> action against the defendant vessel DEEP BLUE and pursuant to Supplemental Rule E(8) of the Federal Rule of Civil Procedure, and . . . [no] other claim." (Doc. 10.)

directly in February of 2015 when he joined the PwC team on-site in Aalborg, Denmark, the headquarters of the OW Bunker Group, to lead the collection of the Group's book debt, that is, receivables, which totaled approximately 1.3 billion dollars (T.T. 190-192). Later, Cartwright was appointed as one of the Group's joint receivers. (*See id.* at 191.)

The initial appointment of receivers[32] over the receivables on charge occurred in November of 2014, "shortly after the bankruptcy occasions" of the OW Bunker Group entities (T.T. 193; *see also* ING's Trial Exhibit 5 (deed of appointment of receivers)); it was the witness's presumption that the enforcement event referenced in the Deed of Appointment of Receivers (hereinafter, "Deed") was "the first bankruptcy occasion" given the referenced date of November 6, 2014 (*compare id.,* at 1, RECITALS ¶ (a) *with* T.T. 193-194). With respect to the Security Assets paragraph of the Deed (ING's Trial Exhibit 5, at 1 ("All of the assets and rights, title and interest of each Receivables Chargor, each Danish Receivables Chargor, each Insurance Chargor and each Broker Chargor (each as defined in the Security Agreement) held in those respective capacities which are the subject of any security created by the Security Agreement.")), Cartwright testified that "chargors are the legal entities caught by the charge, if you like[]" and that the receivables "would be the money owed to those legal entities." (T.T. 194.) In Schedule I attached to the Deed, that is, the schedule of chargors, OW Bunkers UK is included in the list of receivable chargors. (*Compare* ING's Trial Exhibit 5, at 4 *with* T.T. 194.) In addition, PwC (as the receivers) and ING Bank (as security agent) entered into cooperation agreements with the insolvent OW Bunker estates—which were

---

[32]     The three receivers initially appointed were all from PwC UK. (*See* ING's Trial Exhibit 5, at 1.)

"published" to the "end" customers[33]—whereby it was agreed that the PwC receivers and ING would collect the money (which was "ultimately" owed to ING Bank) and those insolvent estates would agree that "they had been paid the debt" (T.T. 195-196; *see* T.T. 209 (the cooperation agreement simply clarifies who collects the money)); one of the first cooperation agreements executed was that between the PwC receivers, ING Bank, and OW Bunkers UK on December 22, 2014 (*compare id.* at 196 *with* ING's Trial Exhibit 36). Each agreement contained a challenge period—here, March 22, 2015 to June 22, 2015—whereby the OW Bunker entity—here, OW Bunkers UK—could challenge the receivers right to collect on behalf of ING (*compare* T.T. 197 *with* ING's Trial Exhibit 36, at 4); OW Bunkers UK never lodged a security challenge under the Co-Operation Deed (T.T. 197). Moreover, by letter dated January 16, 2015, Charles MacMillan confirmed to customers of OW Bunkers UK his appointment as Administrator of OW Bunkers UK and his entry into the aforementioned Co-operation Agreement and advised those customers that "[i]n accordance with the Co-operation Agreement any monies due to the Company [that is, OW Bunkers UK] should be paid to the ING account[.]" (ING Trial Exhibit 11, at 1; *see also* T.T. 198; T.T. 199 ("[T]he administrator is telling the customers that [payment to the ING account] would extinguish the obligation to the company [OW Bunkers UK] itself.").)

The just described rights exercised by the receivers were undertaken pursuant to the Credit Agreement dated December 19, 2013 and the Security Agreement also dated December 19, 2013. (*Compare* T.T. 199-207 *with* ING's Trial Exhibits 1 & 2.) Pursuant to the Credit Agreement, ING and a group of lenders agreed to lend up to a maximum

---

[33]   (*Compare* T.T. 198 *with* ING Trial Exhibit 10 (press release advising OW Bunkers UK's customers in the marketplace that OW Bunkers UK had assigned and charged to ING all rights, title, and interest in its third-party and intercompany receivables).)

$700 million to the OW Bunker Group entities around the world; the agreement was revolving because the number was movable dependent "upon the level of receivables that the company [OW Bunker Group entities] has issued at any point and it negates them, but it would never exceed 700 million." (T.T. 200; *see also* ING Trial Exhibit 2.) In other words, under this agreement the OW Bunker Group of entities could only borrow money from ING and the group of lenders against the Group's receivables such that if the receivables increased there was an ability to borrow more, subject to the cap, while a decrease in receivables would have a concomitant negative impact on the ability to borrow. (T.T. 201-202; *see also* ING Trial Exhibit 2.) ING was named the security agent under the Credit Agreement, which required ING to "administrate" the $700 million credit facility on behalf of all the other lending banks (*see* T.T. 202) and as of the date of the initial OW Bunker Group insolvency, the OW Bunker entities had borrowed approximately $650 million from ING and the other lenders (T.T. 207).[34]

As security for the $700 million credit facility, the group of lenders, led by ING as security agent, predominately received in the Security Agreement, also dated December 19, 2013, "the receivables of the entities listed as chargors[.]" (T.T. 203; *see also* ING Trial Exhibit 1.)

> Each Receivables Chargor . . . hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for reassignment or redemption, all of its rights, title and interest in respect of the Supply Receivables.

---

[34] Although ING has sold its portion of the $650 million loan, it is still acting as security agent to enforce the loan. (T.T. 208.) "The debt is the same debt. It's just the beneficiary of the debt has changed. So the money is paid into an ING account, and then if a distribution were to be made, ING would organize that based on who the current beneficiaries were at that date and time." (T.T. 209.)

(ING Trial Exhibit 1, at ¶ 2.3(a); *see also* T.T. 204.) According to John Cartwright, this clause of the Security Agreement refers to "supply receivables, which is the invoices due to the various chargor entit[ies][]" (T.T. 205), and allows ING (and the other lenders) to stand in the shoes of each receivables chargor in order to collect debts but does not require them (ING, etc.) to take on the obligations of any of the receivables chargors (T.T. 205-206).[35] The Security Agreement identifies OW Bunkers UK as a receivables chargor. (ING Trial Exhibit 1, at 28; *see also* T.T. 205.)

In a relatively early press release statement by the aforementioned receivers confirming their appointment (*see* T.T. 210), Paul Copley, a joint receiver and PwC UK partner, made the following comments:

> [W]e are aware that some suppliers of the [OW Bunker] group are threatening its customers and in a few cases have started recovery proceedings and arrested ships. We take this very seriously.
>
> If suppliers interfere with lenders' receivables or induce customers to breach their contracts, we reserve the right to pursue them directly for damages associated with their actions. For customers, they will not get a valid discharge from their debt to ING by paying an OW Bunker supplier and we will continue to pursue them.

(ING Trial Exhibit 4, at 2 (quotation marks omitted); *see also* T.T. 211 & 211-212.) Cartwright confirmed that what this document is telling customers of an OW Bunker entity, like Technip, is that if it was to pay Radcliff for the physical supply of fuel on November 1, 2014, then ING would still pursue Technip for the amount invoiced to it by OW Bunkers UK concerning that supply of fuel and, further, that if this Court awards Radcliff money on its claim, ING would still pursue Technip separately for the

---

[35]     According to Cartwright, ING Bank and the other lenders will not recover any profit on the receivables because while they are secured creditors and are entitled to have their approximately $650 million (plus interest) debt paid off, any remaining revenue over and above the debt will fall to the other creditors of the insolvent OW Bunker Group entities. (*See* T.T. 206-207.)

claim under the invoice generated by OW Bunkers UK since ING has the right to be paid for the receivable. (T.T. 212.)

<u>**CONCLUSIONS OF LAW**</u>

The pivotal legal issues for disposition by the Court following the bench trial  are only two in number, as follows: (1) whether Radcliff has a maritime lien on the DEEP BLUE under the Commercial Instruments and Maritime Lien Act ("CIMLA"), 46 U.S.C. § 31342 (*see* Doc. 79, at 2); and/or (2) whether ING has a maritime lien on the DEEP BLUE under the CIMLA, as assignees of all rights, title and interest in and to the supply receivables of OW Bunkers UK (*id.* at 6).

**A.**    **Has Radcliff Established a Valid Maritime Lien for Necessaries Supplied to the DEEP BLUE**? Maritime liens are *stricti juris*[36] and cannot be created by contract; instead, maritime liens arise by operation of law and "are largely statutorily created." *Racal Survey U.S.A., Inc. v. M/V COUNT FLEET,* 231 F.3d 183, 192 (5th Cir. 2000) ("Maritime liens are stricti juris and will not be extended by construction, analogy, or inference."), *cert. denied sub nom. Racal NCS, Inc. v. Tidewater Marine Int'l, Inc.,* 532 U.S. 1051, 121 S.Ct. 2192, 149 L.Ed.2d 1024 (2001). To this end, under the Commercial Instruments and Maritime Lien Act ("CIMLA"), 46 U.S.C. § 31301, *et seq.,* "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner (1) has a maritime lien on the vessel; (2) may bring a civil action in rem to enforce the lien; and (3) is not required to allege or prove in the action

---

[36]    Black's Law Dictionary defines *stricti juris* as follows: "Of strict right of law; according to the exact law, without extension or enhancement in interpretation." *Id.* at 1462 (8th ed. 2004).

that credit was given to the vessel." 46 U.S.C. § 31342(a).[37] Thus, as long recognized by the Eleventh Circuit, "to obtain a maritime lien, a person must: (1) provide necessaries; (2) to a vessel; (3) on the order of the owner or agent." *Galehead, Inc. v. M/V Anglia,* 183 F.3d 1242, 1244 (11th Cir. 1999), citing 46 U.S.C. § 31342(a).

The parties agree, at least with respect to Radcliff's claim, that the first two elements are satisfied in this case: necessaries (i.e., bunker fuel), *O.W. Bunker Malta Ltd. v. M/V TROGIR,* 2013 WL 326993, *3 (C.D. Cal. Jan. 29, 2013) ("Fuel bunkers are 'necessaries' within the meaning of § 31342."), *aff'd,* 602 Fed.Appx. 673 (9th Cir. Mar. 18, 2015), were supplied to the M/V DEEP BLUE. (*See* T.T. 215 ("There [is] only one issue left in dispute, and that is the third issue[.]").) The key disagreement in this case revolves around the third element, that is, whether the fuel bunkers physically delivered to the DEEP BLUE by Radcliff were supplied "on the order of the owner or a person authorized by the owner[.]" 46 U.S.C. § 31342(a).

For its part, Radcliff contends that the fueling of the DEEP BLUE was performed on the order of Technip, the owner of the vessel, or, at the very least, on the order of someone—specifically, the Chief Engineer of the DEEP BLUE—with sufficient management authority to support a maritime lien (that is, a person authorized by the owner). (*See* T.T. 216.) As to the first argument, Radcliff encourages the Court to find *Marine Fuel Supply & Towing v. M/V Ken Lucky,* 869 F.2d 473, 477 (9th Cir. 1988)

---

[37]     In turn, "[t]he following persons are presumed to have authority to procure necessaries for a vessel: (1) the owner; (2) the master; (3) a person entrusted with the management of the vessel at the port of supply; or (4) an officer or agent appointed by (A) the owner; (B) a charterer; (C) an owner pro hac vice; or (D) an agreed buyer in possession of the vessel." 46 U.S.C. § 31341(a).

dispositive of this question[38] given that the Chief Engineer of the DEEP BLUE, Ian Ladyka, initiated the order for fuel pursuant to Technip's fuel policy by making a request to Technip's Aberdeen, Scotland procurement team, who then selected OW Bunkers UK as the supplier, and then Ladyka accepted delivery of the fuel from Radcliff without protest, Technip admittedly knowing within an hour of the nomination and award that Radcliff would be the physical supplier of the fuel. (T.T. 216; *see also* T.T. 220.)

The Ken Lucky, which was subchartered to Bulkferts, Inc., needed bunker fuel when it reached Tampa, Florida, so Bulkferts' managing agent, Eurostem Maritime Limited, contacted Brook Oil Ltd. and Brook, in turn, instructed Gray Bunkering Services to place the order for fuel with Marine Fuel; upon request, Gray sent Marine Fuel a telex notifying it that it had been "'nominated by the ***owner***'" of the Ken Lucky to supply the vessel. 869 F.2d at 475 (emphasis supplied); *see also id.* at 476 ("Appellant argues that the defendants' admission that Marine Fuel sold marine fuel and bunkers to Bulkferts should be admitted and considered by this court. We agree.").

> The parties agree that the order originated from Bulkferts. Thus, we need not reach the question whether the district court's conclusion that Brook was not Bulkfert's agent is erroneous[39] because appellees have already admitted that the fuel and bunkers were sold *to Bulkferts*. We conclude that Marine Fuel need not establish agency between Brook and Bulkferts to fall within the scope of one entitled to a maritime lien under the Act.
>
> Ken Lucky concedes that Bulkferts was authorized to bind the vessel. It is clear that Eurostem, as managing agent for Bulkferts, did order the fuel

---

[38]     (T.T. 216 ("It's our contention, based on the KEN LUCKY case, that [] agency is not required under that situation where the order originates directly from the owner or somebody authorized by the owner.").)

[39]     The district court "found that because no agency relationship existed between Bulkferts and Brook, no presumed authority under the Act was established." *Id.* at 476.

and it is also clear that Marine Fuel delivered the fuel *to the vessel*. Section 971 states that any person furnishing supplies or other necessaries *to a vessel* "upon" the order of a person authorized to bind the vessel shall be entitled to [a] lien. It is clear that Eurostem, as managing agent for Bulkferts, ordered the fuel, and it is also clear that Marine Fuel delivered the fuel *to the vessel*. Bulkferts had statutory authority to order the fuel under section 972 and it did so. Marine Fuel delivered the fuel to the vessel after Bulkferts ordered it.

*Id.* at 477 (emphasis in original; footnote added).

And although plaintiff contends that it need not prove agency in this case, given the ultimate holding in *Ken Lucky, supra* (*see* T.T. 216), the undersigned would be remiss in failing to recognize that in addressing "whether a maritime lien may be asserted by a physical supplier of necessaries" in the situation presented in this case, *Ken Lucky* is regarded as the prototypical "principal/agent[] or middleman line of cases," while *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV,* 199 F.3d 220 (5th Cir. 1999), *cert. denied,* 529 U.S. 1130, 120 S.Ct. 2006, 146 L.Ed.2d 956 (2000), typifies "the general contractor/subcontractor line of cases[.]" *O'Rourke Marine Services L.P., L.L.P. v. M/V COSCO Haifa,* 2016 WL 1544742, *4, 2016 A.M.C. 1098, (S.D. N.Y. Apr. 8, 2016).

These lines of cases are not inconsistent with each other, but instead provide different tests for adjudicating claims for maritime liens based on the nature of the relationship between the vessel owner and the intermediary party that procured the bunkers from the physical supplier. In the general contractor/subcontractor line of cases, courts hold that subcontractors hired by a general contractor to supply necessaries are generally not entitled to assert a lien unless they can show that an entity authorized to bind the vessel controlled the selection of the subcontractor. In the middleman line of cases, courts hold that physical suppliers in a line of agency relationships can assert a lien against vessels, even though there are numerous intermediaries between supplier and vessel.

*Id.*

Returning to Radcliff's argument that *Ken Lucky* relieves it, in a middleman case, of its obligation to establish agency because the order initially emanated from the owner of the vessel, the undersigned cannot agree—even assuming this is a middleman case,

which the analysis set forth *infra* establishes it is not—because the lynchpin to the Court's analysis in *Ken Lucky*—that is, for finding no need to establish agency—was the admission by the defendants that the physical supplier (Marine Fuel) sold fuel and bunkers to the subcharterer (Bulkferts), an entity with presumed authority under the statute, *compare* 869 F.2d at 476 ("Appellant argues that the defendants' admission that Marine Fuel sold marine fuel and bunkers to Bulkferts should be admitted and considered by this court. We agree.") & 477 ("The parties agree that the order originated from Bulkferts. Thus, we need not reach the question whether the district court's conclusion that Brook was not Bulkfert's agent is erroneous because appellees have already admitted that the fuel and bunkers were sold *to Bulkferts*. . . . Ken Lucky concedes that Bulkferts was authorized to bind the vessel.") *with* 46 U.S.C. § 31341(a), a similar admission noticeably being absent in this case.[40]  In other words, because of this critical admission by the defendants, the physical supplier did not have to establish agency because the relationship was established. *See Ken Lucky, supra.* And because no such similar admission exists in this case, and Radcliff has offered no similar evidence that it was "nominated by the owner" to supply the DEEP BLUE with fuel, the physical supplier is simply not relieved of its burden of establishing agency under the statute. Thus, Radcliff's first argument (*see* T.T. 216) fails and this Court need consider any "implicit" agency argument made by Radcliff in order to determine whether this case

---

[40]    Indeed, Technip has maintained at all times, and the evidence bears out, that it purchased the fuel stem from OW Bunkers UK and Radcliff concedes that it invoiced OW Bunker USA for the fuel stem delivery on November 1, 2016, its contractual counterparty. Neither Radcliff nor OW Bunker USA had a contract with Technip and the owner did not direct that Radcliff be its physical supplier or otherwise become involved in the selection of Radcliff as physical supplier.

falls within the principal/agent or middleman line of cases, as opposed to the general contractor/subcontractor line of cases.

In reaching that determination, this Court agrees with the manner in which the Southern District of New York in *O'Rourke Marine Services*, framed the issue, *see supra,* at *4, and simply modifies that framing to the facts of this case, as follows: "In order for a physical supplier in [Radcliff's] position to demonstrate that it provided necessaries to a vessel on the order of a person authorized by the owner,[41] it must demonstrate that the intermediary entities that procured the necessaries—in this case, [OW Bunkers UK and OW Bunker USA]—were in an agency relationship with the vessel or owner of the vessel in question. If such an agency relationship exists, and if the intermediary parties are therefore authorized to bind the vessel to contracts, then the *Marine Fuel Supply* line of cases controls (and [Radcliff] prevails). If no such agency relationship exists, then the *Lake Charles* line of cases controls (and [Radcliff] loses)." *Id.* (footnote added).

As previously indicated, the undersigned cannot agree with plaintiff's position that the OW Bunker entities in this case were brokerage houses and, therefore, broker agents for Technip, inasmuch as the evidence in this case overwhelmingly establishes that the OW Bunker entities were not fuel brokers;[42] Technip never entered into a

---

[41]    To the extent the undersigned's analysis is somehow perceived as not adequately addressing Radcliff's argument that it furnished the bunkers on the order of the owner, this Court simply finds that the evidence clearly establishes that no order emanated to Radcliff from Technip and there was no contract between Radcliff and Technip; instead, the only order Radcliff received was from OW Bunker USA on October 23, 2014, Radcliff's contractual counterparty. These are the crucial facts with respect to the lien issue. The logistical delivery arrangements between the DEEP BLUE and Radcliff, the failure of OW personnel to attend the delivery of fuel (or use their own equipment), and the prior fuelings of the DEEP BLUE by Radcliff simply have no bearing on the question of whether Radcliff furnished bunkers on order of Technip.

[42]    Instead, as aforesaid, the OW Bunker entities were traders/sellers/resellers and buyers of fuel.

brokerage or agency agreement with either OW Bunkers UK or OW Bunker USA nor did it agree to pay either OW Bunker entity a brokerage fee or commission for the supply of fuel to the DEEP BLUE; and the parties in this case specifically agreed in the Pretrial Order that OW Bunkers UK subcontracted with OW Bunker USA to act as an intermediary in arranging for the physical supply of the bunkers and that OW Bunker USA subcontracted with Radcliff to physically supply the bunkers to the vessel. The trial record is clear that Technip at no time authorized its contractual counterparty, OW Bunkers UK, to bind the DEEP BLUE or Technip itself; instead, Technip contracted with OW Bunkers UK, which subcontracted with OW Bunker USA to act as an intermediary in arranging for the physical supply of the bunkers, and that OW Bunker USA subcontracted with Radcliff to physically supply the bunkers to the vessel. As in *O'Rourke Marine Services, supra,* "[e]ach step in this supply chain involved a separate contract of purchase and sale[ and] each step was carried out independent of" Technip and the DEEP BLUE. *Id.* at *4; *see also* Doc. 92, Exhibit 1, *ING Bank N.V. v. M/V TEMARA*, No. 16-cv-95, at 14-16 (S.D. N.Y. Aug. 24, 2016) (performing a similar "rungs of the ladder" analysis and finding no agency relationship and, therefore, no maritime lien under CIMLA for the supplier). And, also like in *O'Rourke Marine Services*, OW Bunkers UK invoiced Technip for a greater amount than Radcliff invoiced OW Bunker USA, thereby "further demonstrating that [OW Bunkers UK] was operating as a contractor, not an agent." *Id.* Because the parties in the supply chain below Technip are not agents of Technip, the general contractor/subcontractor cases referenced above apply to the instant action. *See id.*

"Under the general contractor/subcontractor line of cases, a subcontractor cannot assert a maritime lien unless it can show that the vessel or vessel owner specifically directed that the subcontractor be selected as a physical supplier of

necessaries. The reason for this is simple: Without an agency relationship between the vessel and the general contractor, and without actual or apparent authority on the part of the general contractor to bind the vessel to a specific subcontractor, the subcontractor cannot show that it provided necessaries on the order of the owner or its agent." *O'Rourke Marine Services, supra,* at *4; *see also Lake Charles Stevedores, Inc., supra,* 199 F.3d at 229 ("Under the general contractor line, the general contractor supplying necessaries on the order of an entity with authority to bind the vessel has a maritime lien. However, subcontractors hired by those general contractors are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." (internal citations omitted)). No evidence was offered in the trial of this matter establishing that Technip "directed" Radcliff to be its physical supplier of the bunker stem or was in any manner involved in the selection of Radcliff as physical supplier of fuel. Instead, the evidence is clear that Technip awarded the fuel supply contract to OW Bunkers UK for provision of the bunkers—without any knowledge that Radcliff's "dealings" with OW Bunker USA informed the price quoted to the vessel owner by OW Bunkers UK—and only learned that Radcliff would be the physical supplier of the fuel stem one hour *after* the contract award to OW Bunkers UK. Such after-acquired knowledge of Radcliff's involvement, however, is insufficient to give rise to a maritime lien, *see, e.g., Galehead, supra,* 183 F.3d at 1246 ("That a charterer of a vessel becomes aware that some work performed was by a party somewhere down the chain of contracting and re-contracting does not give rise to a maritime lien."); *Port of Portland v. M/V Paralla,* 892 F.2d 825, 828 (9th Cir. 1989) ("Here the Port dealt with Northwest and not with Automar or Automar's managing agent. It cannot be denied that Automar knew that Northwest was using the Port's facilities, but that has never been held to be sufficient to establish a

lien. . . . The Port points out that an owner can still become responsible for the services of a subcontractor, if the owner has ordered the general contractor to retain that subcontractor. We do not deny that possibility. It is indicated by *Farwest* itself. It is also suggested by *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky,* 859 F.2d at 1409, although in that case the connection is a bit more attenuated. Unfortunately for it, the Port's evidence in this respect was quite deficient, and the district court did not err when it determined that no such authority existed. The most the Port has shown is the fact that it was most likely, even perhaps rather certain, that Northwest would choose the facilities of the Port when it did its work. That alone does not constitute a direction or requirement to use those services."); *Valero Marketing & Supply Co. v. M/V Almi Sun, IMO No. 9579535,* 160 F.Supp.3d 973, 983 (E.D. La. 2016) ("[M]erely knowing that a subcontractor would be used, or even that a particular supplier would most likely be used, to ultimately furnish necessaries, does not necessarily create a maritime lien[.]"), and because Radcliff otherwise has failed to demonstrate that it provided necessaries to the DEEP BLUE, on November 1, 2014, "on the order of the owner or a person authorized by the owner[,]" 46 U.S.C. § 31342(a), it has no lien against the DEEP BLUE for the value of the fuel delivered.

However, Radcliff is not finished inasmuch as its "fallback" argument is that, notwithstanding the relationship between it and Technip, the continued actions of the DEEP BLUE's chief engineer in coordinating the delivery of the fuel stem, accepting the fuel onboard, and signing the bunker certificate constitutes ratification sufficient to create a maritime lien, inasmuch as the Chief Engineering Officer of a vessel is a position that has been deemed to be entrusted with the management and operation of

the vessel and presumed to have authority to procure or ratify[43] necessaries pursuant to 46 U.S.C. § 31341 (*see* T.T. 221-223), *compare e.g., Noramco Shipping Corp. v. Bunkers Int'l Corp.,* 2003 WL 22594419, *8 (M.D. Fla. Apr. 30, 2003) ("A subcontractor or third-party can assert a maritime lien against the owner for necessaries provided to the vessel . . . if a person authorized to procure necessaries for a vessel approves the subcontractor's services.") *with Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty,* 608 F.2d 197, 202 (5th Cir. 1979) ("Authorization, actual and fairly presumed, given prior to or during rendition of services, or ratified subsequent to rendition will suffice."), and Technip has not rebutted the statutory presumption with advance notice to Radcliff that the Chief Engineer lacked authority to order such services, *compare Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner,* 724 F.2d 1161, 1163 (5th Cir. 1984) ("This lien attaches when necessaries are ordered by and supplied to a charterer, unless the supplier has notice that the person ***who orders*** the necessaries lacked authority to do so." (emphasis supplied)) *with Ferromet Resources, Inc. v. ChemOil Corp.,* 5 F.3d 902, 904 (5th Cir. 1993) ("The ship's master or other person, such as a charterer, to whom the vessel is entrusted is presumed to have authority ***to purchase necessaries*** to the credit of the vessel. The materialman who furnishes necessaries in response to a request from a master, charterer or other person in custody of the vessel has no duty to inquire about that person's authority to bind the vessel. But the supplier's lien is defeated if he has actual

---

[43]     "[P]*rior* authorization by the owner or the party procuring the repairs is not an essential requisite to preserving a lien position. Although prior authorization would be most relevant and material, our circuit has interpreted the MLA not to require prior authorization. Instead, authorization, either actual or fairly presumed, given prior to or during performance of the services, or ratified subsequent to performance will suffice." *Marine Coatings of Alabama, Inc. v. United States,* 932 F.2d 1370, 1376 (11th Cir. 1991) (internal citations and footnote omitted; emphasis in original).

knowledge that ***the person ordering the necessaries*** has no authority to bind the vessel." (emphasis supplied)).

Unfortunately, however, Radcliff's "fallback" argument also fails for the simple fact that the Chief Engineer in this case did not "himself" order or purchase the fuel bunkers; instead, he can only be regarded as having "initiated" the process and then, upon the fuel contract being awarded to OW Bunkers UK, the Chief Engineer "coordinated" the delivery of the bunkers through emails to and from Radcliff's General Manager and then signed the Bunker Certificate, as required by MARPOL, acknowledging receipt of the bunker fuel. Moreover, in "coordinating" the delivery of the fuel stem, Radcliff's general manager admitted that the "logistical" emails did not constitute some type of contract negotiation, and courts have held that such coordination and acceptance does not rise to the level of ratification. *Compare Lake Charles, supra,* 199 F.3d at 231 & 232 ("LCS argues that the actions on the part of the master of the Vessel operated to ratify its providing stevedoring services and thereby to bind the Vessel. A large portion of its ratification argument rests on the absence of any objection on the part of the Vessel's agents to LCS boarding the Vessel, and on its contention that the Vessel's awareness that LCS was supplying the necessaries is sufficient under the MCILA to constitute authorization. . . . Much of this evidence reduces to a showing that the master of the Vessel allowed LCS on board to perform stevedoring services and accepted those services. Under the contract between Man Sugar and Broussard, Broussard was obligated to deliver the rice free-on-board the Vessel. Had the Vessel's agents not allowed the stevedores to load the rice, they would

have prevented Broussard from fulfilling its contractual obligations.[44] Under these circumstances, we are hesitant to declare that the Vessel's agents subjected the *res* to liability for stevedoring services necessary to enable Broussard to deliver the rice as per its agreement with Man Sugar. As the district court noted, awareness on the part of the Vessel's agents that LCS was apparently the firm chosen by Broussard to load the rice is insufficient under the MCILA to constitute authorization. . . . A holding that awareness that necessaries are being supplied was sufficient, even though those necessaries were procured by an entity without authority to bind the vessel, would render the statute's authority requirement meaningless. We must also reject LCS' contention that acceptance of LCS' services and the rice aboard ship provided the necessary authorization to entitle it to a lien. It is a settled principle of contract law that a contract requiring A to supply X to C is satisfied if B, hired by A, provides X to C. . . . Under the circumstances here, the delivery of the rice, though performed by LCS, is attributed to Broussard. Acceptance of the rice on the part of the Vessel, through signing of Activity Sheets and the Mate's Receipt, was therefore acceptance of Broussard's rice and Broussard's delivery of that rice. . . . As a result, we do not view the activities on the part of the Vessel's master and crew to constitute ratification.") *with Valero Marketing & Supply Co., supra,* 160 F.Supp.3d at 985 ("[T]he fact that the Vessel's captain was forewarned by Almi Tankers that the Vessel would be receiving bunkers from Valero and given instructions to coordinate with Valero . . . [does not] amount[] to ratification

---

[44]     The undersigned finds this language particularly compelling inasmuch as under the contract between Technip and OW Bunkers UK, OW Bunkers UK was obligated to deliver fuel bunkers to the DEEP BLUE and had the agents of the DEEP BLUE (specifically, the chief engineer) not allowed Radcliff to physically deliver the bunker fuel, OW Bunkers UK would have been prevented from fulfilling its contractual obligations to Technip. *See Valero Marketing & Supply Co. v. M/V Almi Sun,* 2015 WL 9459971, *11 (E.D. La. Dec. 2, 2015) (similar analysis).

of a maritime lien against the Vessel."). And, finally, the fact that the chief engineer signed a bunker delivery receipt which contained "lien" language on the front (the "No disclaimer stamp . . ." language) and terms and conditions on the back also containing additional "lien" language does not amount to ratification of a maritime lien because maritime liens are not creatures of contract—but of law—and "[t]he mere signature of a receipt alleging the existence of a lien cannot create such a lien if the statutory requirements for the lien are not met[,]" *O'Rourke Marine Services, supra,* at *4; *see* Doc. 92, Exhibit 2, *Aegean Bunkering (USA) LLC v. M/V AMAZON,* 14-cv-9447, *22 (S.D. N.Y. Aug. 24, 2016) ("[T]he delivery receipt argument is a red herring. The argument amounts to nothing more than an attempt to create a maritime lien by contract – something the law does not allow.");[45] *Valero Marketing & Supply Co., supra,* at *12 ("[N]either the Bunker Contract nor the Bunkering Certificate, nor the Vessel's acceptance of Valero's bunkers, could create a maritime lien where, as here, Valero has failed to point to evidence that the Vessel's owners directed the selection of Valero or otherwise retained sufficient control over the subcontractor's performance such that the Vessel became subject to a maritime lien held by Valero."), particularly where, as here, the chief engineer was required by MARPOL to sign the bunker receipt acknowledging delivery of the bunkers.

In light of the foregoing, the Court finds that although Radcliff provided necessaries to the DEEP BLUE on November 1, 2014, it has failed to establish that its provision of bunker fuel was on the order of the owner or a person authorized by the

---

[45]   To the extent it is necessary, the undersigned disagrees with the plaintiff's reading of ¶ L.4(a) of the OW Bunker Terms and Conditions (*see, supra,* fn. 27), for those same reasons identified by the Southern District of New York in *ING Bank N.V., supra,* at 16-19, and *Aegean Bunkering (USA) LLC, supra,* at 24-27.

owner, as required by the statute, 46 U.S.C. § 31342(a); therefore, Radcliff holds no maritime lien.

**B.    Does  ING have a maritime lien on the DEEP BLUE under the CIMLA, as assignees of all rights, title and interest in and to the supply receivables of OW Bunkers UK?**  Before addressing the question of whether or not the aforementioned Omnibus Security Agreement creates an enforceable lien right, the Court need consider plaintiff's argument that OW Bunkers UK has no maritime lien because it (Radcliff) was not paid for the fuel it delivered to the DEEP BLUE. (*See generally* T.T. 225-227.) "The case law is that they would have a maritime lien without providing necessaries so long as they paid . . . their local supplier." (*Id.* at 226; *see also id.* ("They ordered the fuel and didn't pay the local supplier for that fuel. So you can't furnish fuel without paying for the fuel. They've never paid us. So they are not subrogated.").)

With this argument, plaintiff takes direct aim at the first element necessary to obtain a maritime lien, that is, the provision of necessaries. *See Galehead, supra,* 183 F.3d at 1244.  Plaintiff concedes that "a party need not be the physical supplier or deliverer to have 'provided' necessaries under the statute[,]" *Galehead, supra,* 183 F.3d at 1245, but contends that this is true only when the physical supplier of fuel has itself been paid for the fuel (*see* T.T. 226). *See Galehead,* 183 F.3d at 1244 (physical suppliers paid); *A/S Dan-Bunkering Ltd. v. M/V Zamet,* 945 F.Supp. 1576, 1578 (S.D. Ga. 1996) (physical supplier paid); *Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.,* 519 F.Supp.2d 399, 402 (S.D. N.Y. 2007) (physical supplier paid); *Noramco, supra,* at *2 (physical supplier paid); *Exxon Corp. v. Central GulfLines Inc.,* 780 F.Supp. 191, 192 (S.D. N.Y. 1991) (physical supplier paid).

This Court, however, cannot agree with plaintiff's argument in this regard inasmuch as the general rule recognized in *Galehead, supra,* 183 F.3d at 1245 ("[A] party

need not be the physical supplier or deliverer to have 'provided' necessaries under the statute."), simply cannot be read as adding the requirement that a physical supplier be paid first before a contract supplier is entitled to a lien, *see id.* Indeed, the undersigned concludes that OW Bunkers UK would have a maritime lien because it took the order from Technip (the owner of the vessel) and necessaries (fuel bunkers) were furnished to the DEEP BLUE. *See Galehead, supra,* 183 F.3d at 1244 & 1245; *compare id. with O'Rourke Marine Services, supra,* at *5 ("[T]he party contractually obligated to supply fuel to a vessel is entitled to a maritime lien, despite the fact that it caused another supplier to actually deliver the ordered fuel to the vessel."). A subrogation situation simply does not exist in this case, whereby OW Bunkers UK/ING would step into Radcliff's shoes after paying the physical supplier, because, as reflected above, plaintiff does not have any lien rights which may be subrogated.

As a prelude to adjudicating the legal issue addressed by the declarations of the English barristers, that is, the scope of the rights assigned to ING under the aforementioned Security Agreement, the Court need highlight some of the trial testimony of John Bruce Cartwright, a chartered accountant and partner at PwC UK and a current receiver for the OW Bunker Group. Cartwright testified that pursuant to a Credit Agreement dated December 19, 2013, ING Bank and a group of lenders agreed to lend the OW Bunker Group entities up to a maximum of $700 million—with ING as security agent to administrate the $700 million credit facility—tied to the Group's receivables and as security for the $700 million credit facility, the group of lenders, led by ING as security agent,[46] received in the Security Agreement the receivables of the

---

[46]     Cartwright testified that ING is still the security agent and is entitled, under the Credit Agreement and Security Agreement, to enforce all of the rights of the OW Bunker entities under those documents.

entities listed as receivables chargors, which list includes OW Bunkers UK. Cartwright's testimony was that Clause 2.3(a) of the Security Agreement refers to "supply receivables," that is the invoices due to the various chargor entities, and allows ING (and the other lenders) to stand in the shoes of each receivables chargor in order to collect debts (as Cartwright put it, the full basket of rights) but does not require them to take on the obligations of any of the receivables chargors.

It was Cartwright's testimony that shortly after the collapse of the OW Bunker Group and the onset of insolvencies of most of the OW entities, receivers were appointed for the OW Bunker Group to collect the Group's book debt, that is, receivables, as reflected in the Deed of Appointment of Receivers. In explaining the Security Assets paragraph of the Deed (*see* ING's Trial Exhibit 5, at 1 ("All of the assets and rights, title and interest of each Receivables Chargor, each Danish Receivables Chargor, each Insurance Chargor and each Broker Chargor (each as defined in the Security Agreement) held in those respective capacities which are the subject of any security created by the Security Agreement.")), Cartwright testified that the chargors would be the legal entities "caught by the charge" and the receivables would be the money owing to those legal entities.[47] In addition, PwC (as receivers) and ING (as security agent) entered into cooperation agreements with the insolvent OW Bunker estates, one of the first such agreements executed being that between the PwC receivers, ING, and OW Bunkers UK on December 22, 2014, whereby it was agreed that the PwC receivers and ING would collect the money ("ultimately" owed to ING) and each

---

[47]     In Schedule I attached to the Deed, OW Bunkers UK is included in the list of receivables chargors.

insolvent estate would agree it had been paid the debt.[48] The OW Bunkers UK cooperation agreement contained a challenge period during which OW Bunkers UK could have challenged the right of the receivers to collect on behalf of ING; however, according to Cartwright, no security challenge was ever lodged by OW Bunkers UK. Indeed, instead, when Charles MacMillan confirmed to customers of OW Bunkers UK his appointment as Administrator of OW Bunkers UK and his entry into the cooperation agreement, he informed those customers that payment into the ING account of any monies due to OW Bunkers UK would extinguish the obligations to OW Bunkers UK.

With Cartwright's testimony firmly in place, the undersigned "returns" to the scope of the rights assigned to ING under the aforementioned Security Agreement, which involves application and interpretation of English law as set forth in the competing declarations of Antony James Zacaroli QC (for ING) and Peter John Sibley MacDonald Eggers QC (for Radcliff).[49] The key clause of the Security Agreement at issue, of course, is Clause 2.3(a), which reads, as follows: "Each Receivables Chargor[50] . . . hereby agrees to assign and hereby assigns absolutely, with effect as of the date of this Deed, subject to a proviso for reassignment on redemption, ***all of its rights, title and interest in respect of the Supply Receivables.***" (ING Trial Exhibit 1, at 7 (emphasis

---

[48]      In other words, the cooperation agreements simply clarified who would collect the debt and were "published" to the end customers by press releases issued by PwC, for example, to OW Bunkers UK's customers in the marketplace advising that OW Bunkers UK had assigned and charged to ING all rights, title, and interest in its third-party and intercompany debt.

[49]      Mr. MacDonald Eggers and Mr. Zacaroli are both Queen's Counsel, that is, senior barristers. (*Compare* ING Trial Exhibit 41, at ¶ 1 *with* Radcliff's Trial Exhibit 13, at ¶ 1.)

[50]      As previously established by the testimony and evidence in this case, OW Bunkers UK is a Receivables Chargor.

supplied).) The Security Agreement defines "Supply Receivables" in Clause 1.1 as "any amount owing, or to be owed, to a Receivables Chargor . . . under any Supply Contract[,] and "Supply Contract" as "any one-time contract, any contract used as a framework agreement (howsoever described) or the overarching general terms and conditions of the Group, in each case governed by English law and relating to the sale of oil products traded by the Group, as governs: (a) the contractual relationship between the relevant debtor and a Receivables Chargor at any time . . . and shall in each case include any invoice issued thereunder . . . ." (*Id.* at 5.)

And while it is all too clear that the Security Agreement nowhere makes mention of "maritime liens," that is, it does not say maritime liens are assigned, it actually utilizes much broader language in assigning all "rights, title and interest in respect of the Supply Receivables[,]" as explained by Mr. Zacaroli. This Court specifically agrees with the conclusion reached by Mr. Zacaroli that a maritime lien "is within the category of '*rights . . . in respect of*' the Supply Receivables and thus assigned to ING[]" (ING's Trial Exhibit 41, at ¶ 25 (emphasis in original))[51] and, in so concluding, adopts as its own the following statements/analysis of Mr. Zacaroli:

> 17.    It is important to note that the subject matter of the assignment in clause 2.3(a) of the Security Agreement is all rights, title and interest "*in respect of*" the amounts owing or to be owed under any Supply Contract. Rights, title and interest "*in respect of*" a debt is a wider concept than rights, title and interest "*under*" a debt.
>
> 18.    Whereas an assignment of rights, title and interest "*under*" amounts owing under any Supply Contract would (in the absence of contrary indications in the remainder of the agreement or the circumstances in which it was entered into) suggest that the subject matter of the assignment was limited to the right to be paid the Supply Receivable, the assignment of rights, title and interest "*in respect of*" any

---

[51]    This conclusion is inherently reasonable and appropriate in light of the trial testimony of John Bruce Cartwright.

amounts owing under any Supply Contract indicates that the subject matter of the assignment is broader and extends to rights, beyond the mere right to be paid, which are connected with that right.

19.    In particular, OW UK's right, title and interest in any maritime lien that arises as security for the payment of amounts owing under the Supply Contract is . . . clearly one of its "*rights*" in connection with the amount owing under the Supply Contract, i.e., one of its "*rights*" in respect of the Supply Receivables. That is so whether the lien arises pursuant to the general law or pursuant to rights granted by the contract. A reasonable person, with the background knowledge reasonably available to the parties would . . . have understood the reference to "*all rights . . . in respect of*" the Supply Receivables to include such rights of security in relation to the Supply Receivables of which OWB had, or later acquired, the benefit.

(*Id.* at ¶¶ 17-19 (emphasis in original).)[52]

It follows from the foregoing that all rights, title and interest in respect of the Supply Receivables under ING's Security Agreement include any and all of OW Bunkers UK's maritime liens. Because, as explained above, OW Bunkers UK possesses a maritime lien in this case for the value of the bunker stem delivered to the DEEP BLUE on November 1, 2014, ING now holds that lien by virtue of the assignment of that right in the Security Agreement.

C.    **Prejudgment Interest.**  It appears to the Court that ING is entitled to prejudgment interest from the date of loss. *See Gulf Marine & Indus. Supplies, Inc. v. M/V Golden Prince,* 1999 WL 670997, *4 (E.D. La. Aug. 25, 1999) ("'[T]he allowance of prejudgment interest is within the discretion of the admiralty court, and, generally, it should be allowed from the date of the loss.'"). Technip and ING are to confer on this issue and agree to the correct amount of interest due and owing ING, not later than

---

[52]    The undersigned simply notes that this Court cannot agree with the interpretation of Clause 2.3(a) put forth by Mr. MacDonald Eggers (*see* Radcliff's Trial Exhibit 13, at ¶¶ 25-35) inasmuch as it fails to give due consideration to the critical language of the clause, that is, the words "*in respect of.*" (*See* ING's Trial Exhibit 42, at ¶¶ 6-9.)

**October 12, 2016**; in absence of agreement, Technip and ING are to brief the issue of prejudgment interest not later than **October 12, 2016.**[53]

### CONCLUSION

For the reasons set forth above, the Court concludes that Radcliff does not possess a maritime lien for the bunker stem it delivered to the DEEP BLUE on November 1, 2014; however, ING does possess a maritime lien for the value of the bunker stem delivered to the DEEP BLUE on November 1, 2014, by virtue of OW Bunkers UK's assignment of that right in the Security Agreement. Judgment will be entered by separate order once the Court is informed by Technip and ING that they have reached agreement regarding the correct calculation of prejudgment interest and, therefore, the proper amount due and owing ING or, otherwise, the briefs of Technip and ING addressed to this remaining issue have been filed and due consideration has been given to the arguments contained in those briefs.

**DONE** and **ORDERED** this 28th day of September, 2016.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

[53]     It does not appear to the Court that ING would be entitled to an award of attorney's fees. *See Bradford Marine, Inc. v. M/V Sea Falcon,* 64 F.3d 585, 589 (11th Cir. 1995) ("Bradford's argument that the attorney's fees in this case are properly charged against the *Sea Falcon in rem* can succeed only if the fees, which Bradford incurred as a result of retaining legal counsel to pursue a claim against the *Sea Falcon* and its owners, were (1) 'necessaries' and (2) provided to the *Sea Falcon*.").