## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| BARCLIFF, LLC, d/b/a  RADCLIFF/ ECONOMY MARINE SERVICES, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | CA 14-0590-C (ADMIRALTY) |
| M/V DEEP BLUE, IMO NO. 9215359, her engines, apparel, furniture, equipment, appurtenances, tackle, etc., *in rem*, | : | |
| | : | |
| Defendant. | : | |

## ORDER

This cause is back before the Court on plaintiff's Rule 59 motion for new trial or to alter or amend the judgment (Doc. 97), the opposition of Technip UK Limited (Doc. 99), the memorandum in opposition of intervenor ING Bank N.V. (Doc. 100), plaintiff's reply (Doc. 101), and the sur-reply of ING Bank (Doc. 102, Exhibit A)[1]. This order **DENYING** plaintiff's motion for new trial or to alter or amend the judgment (Doc. 97) is entered pursuant to 28 U.S.C. § 636(c), Fed.R.Civ.P. 73, and S.D.Ala. GenLR 73.

## PROCEDURAL BACKGROUND

This nonjury action came on for a bench trial before the undersigned on June 22-23, 2016. (*See* Doc. 93, at 1.) On September 28, 2016, the Court entered a memorandum opinion and order and therein determined, in relevant measure, that Radcliff did "not possess a maritime lien for the bunker stem it delivered to the DEEP BLUE on November

---

[1]      ING Bank's motion to file sur-reply (Doc. 102) is **GRANTED**, and the undersigned has considered that sur-reply in crafting this Order.

1, 2014[,]" but that ING did "possess a maritime lien for the value of the bunker stem delivered to the DEEP BLUE on November 1, 2014, by virtue of OW Bunkers UK's assignment of that right in the Security Agreement." (*Id.* at 36.)[2] In reaching these conclusions, the Court addressed plaintiff's litany of arguments regarding how it had established that it had supplied necessaries (bunker fuel) to the DEEP BLUE on November 1, 2014 "on the order of the owner or agent" (Doc. 93, at 18-30) but ultimately concluded that plaintiff held no maritime lien because it "failed to establish that its provision of bunker fuel was on the order of the owner or a person authorized by the owner, as required by statute, 46 U.S.C. § 31342(a)[3][.]" (*Id.* at 29-30 (footnote added).) And, after concluding that plaintiff had no maritime lien, the Court went on to determine that ING possessed a maritime lien as assignee of all rights, title and interest in and to the supply receivables of OW Bunkers UK (*id.* at 35); however, before determining that the Omnibus Security Agreement created an enforceable lien right, the Court rejected plaintiff's argument that OW Bunkers UK could have no maritime lien without first paying Radcliff for the fuel it delivered to the DEEP BLUE (*see id.* at 30-31). Because Radcliff, in its Rule 59 motion, references this Court's citation to various decisions putatively authored by United States District Judge Katherine B. Forrest—

---

[2]     The Court reserved entry of judgment in ING's favor until resolution of the prejudgment interest issue. (*See id.*) Once Technip and ING advised the Court that they had reached a confidential settlement regarding the amount of prejudgment interest to be paid (Doc. 95), the Court entered its final judgment on October 21, 2016 (Doc. 96), in accordance with the memorandum opinion and order entered on September 28, 2016 (Doc. 93).

[3]     Pursuant to this section of the Commercial Instruments and Maritime Lien Act ("CIMLA"), "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner (1) has a maritime lien on the vessel[.]" 46 U.S.C. § 31342(a)(1); *see also Galehead, Inc. v. M/V Anglia*, 183 F.3d 1242, 1244 (11th Cir. 1999) ("[T]o obtain a maritime lien, a person must: (1) provide necessaries; (2) to a vessel; (3) on the order of the owner or agent.").

namely, *O'Rourke Marine Services L.P., L.L.P. v. M/V COSCO Haifa,* 2016 WL 1544742, *4,

2016 A.M.C. 1098, (S.D. N.Y. Apr. 8, 2016),[4] *ING Bank N.V. v. M/V TEMARA*, No. 16-cv-

95, at 14-16 (S.D. N.Y. Aug. 24, 2016), and *Aegean Bunkering (USA) LLC v. M/V*

*AMAZON,* 14-cv-9447, *22 (S.D. N.Y. Aug. 24, 2016)—"as additional authority that

Barcliff did not possess a maritime lien [] and for the holding that OW Bunkers did not

have to pay the physical supplier to meet the 'providing' requirement under the

Commercial Instruments and Maritime Lien Act[,] (Doc. 97, at 1-2), the Court simply sets

out the entirety of the relevant portions of its decision.

   For its part, Radcliff contends that the fueling of the DEEP BLUE
was performed on the order of Technip, the owner of the vessel, or, at the
very least, on the order of someone—specifically, the Chief Engineer of the
DEEP BLUE—with sufficient management authority to support a
maritime lien (that is, a person authorized by the owner). (*See* T.T. 216.) As
to the first argument, Radcliff encourages the Court to find *Marine Fuel
Supply & Towing v. M/V Ken Lucky,* 869 F.2d 473, 477 (9th Cir. 1988)
dispositive of this question given that the Chief Engineer of the DEEP
BLUE, Ian Ladyka, initiated the order for fuel pursuant to Technip's fuel
policy by making a request to Technip's Aberdeen, Scotland procurement
team, who then selected OW Bunkers UK as the supplier, and then
Ladyka accepted delivery of the fuel from Radcliff without protest,
Technip admittedly knowing within an hour of the nomination and award
that Radcliff would be the physical supplier of the fuel. (T.T. 216; *see also*
T.T. 220.)

   The Ken Lucky, which was subchartered to Bulkferts, Inc., needed
bunker fuel when it reached Tampa, Florida, so Bulkferts' managing
agent, Eurostem Maritime Limited, contacted Brook Oil Ltd. and Brook, in
turn, instructed Gray Bunkering Services to place the order for fuel with
Marine Fuel; upon request, Gray sent Marine Fuel a telex notifying it that
it had been "'nominated by the ***owner***'" of the Ken Lucky to supply the
vessel. 869 F.2d at 475 (emphasis supplied); *see also id.* at 476 ("Appellant
argues that the defendants' admission that Marine Fuel sold marine fuel
and bunkers to Bulkferts should be admitted and considered by this court.
We agree.").

---

[4]  As it turns out, *O'Rourke* was not authored by Judge Forrest; instead, that decision
was authored by United States District Judge Shira A. Scheindlin. *See O'Rourke Marine Services
L.P., L.L.P. v. M/V COSCO Haifa,* 179 F.Supp.3d 333, 333 & 334 (S.D. N.Y. 2016).

The parties agree that the order originated from Bulkferts. Thus, we need not reach the question whether the district court's conclusion that Brook was not Bulkfert's agent is erroneous because appellees have already admitted that the fuel and bunkers were sold *to Bulkferts*. We conclude that Marine Fuel need not establish agency between Brook and Bulkferts to fall within the scope of one entitled to a maritime lien under the Act.

Ken Lucky concedes that Bulkferts was authorized to bind the vessel. It is clear that Eurostem, as managing agent for Bulkferts, did order the fuel and it is also clear that Marine Fuel delivered the fuel *to the vessel*. Section 971 states that any person furnishing supplies or other necessaries *to a vessel* "upon" the order of a person authorized to bind the vessel shall be entitled to [a] lien. It is clear that Eurostem, as managing agent for Bulkferts, ordered the fuel, and it is also clear that Marine Fuel delivered the fuel *to the vessel*. Bulkferts had statutory authority to order the fuel under section 972 and it did so. Marine Fuel delivered the fuel to the vessel after Bulkferts ordered it.

*Id.* at 477 (emphasis in original; footnote added).

And although plaintiff contends that it need not prove agency in this case, given the ultimate holding in *Ken Lucky, supra* (*see* T.T. 216), the undersigned would be remiss in failing to recognize that in addressing "whether a maritime lien may be asserted by a physical supplier of necessaries" in the situation presented in this case, *Ken Lucky* is regarded as the prototypical "principal/agent[] or middleman line of cases," while *Lake Charles Stevedores, Inc. v. PROFESSOR VLADIMIR POPOV MV,* 199 F.3d 220 (5th Cir. 1999), *cert. denied,* 529 U.S. 1130, 120 S.Ct. 2006, 146 L.Ed.2d 956 (2000), typifies "the general contractor/subcontractor line of cases[.]" *O'Rourke Marine Services L.P., L.L.P. v. M/V COSCO Haifa,* 2016 WL 1544742, *4, 2016 A.M.C. 1098, (S.D. N.Y. Apr. 8, 2016).

These lines of cases are not inconsistent with each other, but instead provide different tests for adjudicating claims for maritime liens based on the nature of the relationship between the vessel owner and the intermediary party that procured the bunkers from the physical supplier. In the general contractor/subcontractor line of cases, courts hold that subcontractors hired by a general contractor to supply necessaries are generally not entitled to assert a lien unless they can show that an entity authorized to bind the vessel controlled the selection of the subcontractor. In the

4

> middleman line of cases, courts hold that physical suppliers
> in a line of agency relationships can assert a lien against
> vessels, even though there are numerous intermediaries
> between supplier and vessel.

*Id.*

Returning to Radcliff's argument that *Ken Lucky* relieves it, in a middleman case, of its obligation to establish agency because the order initially emanated from the owner of the vessel, the undersigned cannot agree—even assuming this is a middleman case, which the analysis set forth *infra* establishes it is not—because the lynchpin to the Court's analysis in *Ken Lucky*—that is, for finding no need to establish agency—was the admission by the defendants that the physical supplier (Marine Fuel) sold fuel and bunkers to the subcharterer (Bulkferts), an entity with presumed authority under the statute, *compare* 869 F.2d at 476 ("Appellant argues that the defendants' admission that Marine Fuel sold marine fuel and bunkers to Bulkferts should be admitted and considered by this court. We agree.") & 477 ("The parties agree that the order originated from Bulkferts. Thus, we need not reach the question whether the district court's conclusion that Brook was not Bulkfert's agent is erroneous because appellees have already admitted that the fuel and bunkers were sold *to Bulkferts*. . . .   Ken Lucky concedes that Bulkferts was authorized to bind the vessel.") *with* 46 U.S.C. § 31341(a), a similar admission noticeably being absent in this case. In other words, because of this critical admission by the defendants, the physical supplier did not have to establish agency because the relationship was established. *See Ken Lucky, supra.* And because no such similar admission exists in this case, and Radcliff has offered no similar evidence that it was "nominated by the owner" to supply the DEEP BLUE with fuel, the physical supplier is simply not relieved of its burden of establishing agency under the statute. Thus, Radcliff's first argument (*see* T.T. 216) fails and this Court need consider any "implicit" agency argument made by Radcliff in order to determine whether this case falls within the principal/agent or middleman line of cases, as opposed to the general contractor/subcontractor line of cases.

In reaching that determination, this Court agrees with the manner in which the Southern District of New York in *O'Rourke Marine Services,* framed the issue, *see supra,* at *4, and simply modifies that framing to the facts of this case, as follows: "In order for a physical supplier in [Radcliff's] position to demonstrate that it provided necessaries to a vessel on the order of a person authorized by the owner, it must demonstrate that the intermediary entities that procured the necessaries—in this case, [OW Bunkers UK and OW Bunker USA]—were in an agency relationship with the vessel or owner of the vessel in question. If such an agency relationship exists, and if the intermediary parties are therefore authorized

to bind the vessel to contracts, then the *Marine Fuel Supply* line of cases controls (and [Radcliff] prevails). If no such agency relationship exists, then the *Lake Charles* line of cases controls (and [Radcliff] loses)." *Id.* (footnote added).

As previously indicated, the undersigned cannot agree with plaintiff's position that the OW Bunker entities in this case were brokerage houses and, therefore, broker agents for Technip, inasmuch as the evidence in this case overwhelmingly establishes that the OW Bunker entities were not fuel brokers; Technip never entered into a brokerage or agency agreement with either OW Bunkers UK or OW Bunker USA nor did it agree to pay either OW Bunker entity a brokerage fee or commission for the supply of fuel to the DEEP BLUE; and the parties in this case specifically agreed in the Pretrial Order that OW Bunkers UK subcontracted with OW Bunker USA to act as an intermediary in arranging for the physical supply of the bunkers and that OW Bunker USA subcontracted with Radcliff to physically supply the bunkers to the vessel. The trial record is clear that Technip at no time authorized its contractual counterparty, OW Bunkers UK, to bind the DEEP BLUE or Technip itself; instead, Technip contracted with OW Bunkers UK, which subcontracted with OW Bunker USA to act as an intermediary in arranging for the physical supply of the bunkers, and that OW Bunker USA subcontracted with Radcliff to physically supply the bunkers to the vessel. As in *O'Rourke Marine Services, supra,* "[e]ach step in this supply chain involved a separate contract of purchase and sale[ and] each step was carried out independent of" Technip and the DEEP BLUE. *Id.* at *4; *see also* Doc. 92, Exhibit 1, *ING Bank N.V. v. M/V TEMARA*, No. 16-cv-95, at 14-16 (S.D. N.Y. Aug. 24, 2016) (performing a similar "rungs of the ladder" analysis and finding no agency relationship and, therefore, no maritime lien under CIMLA for the supplier). And, also like in *O'Rourke Marine Services*, OW Bunkers UK invoiced Technip for a greater amount than Radcliff invoiced OW Bunker USA, thereby "further demonstrating that [OW Bunkers UK] was operating as a contractor, not an agent." *Id.* Because the parties in the supply chain below Technip are not agents of Technip, the general contractor/subcontractor cases referenced above apply to the instant action. *See id.*

"Under the general contractor/subcontractor line of cases, a subcontractor cannot assert a maritime lien unless it can show that the vessel or vessel owner specifically directed that the subcontractor be selected as a physical supplier of necessaries. The reason for this is simple: Without an agency relationship between the vessel and the general contractor, and without actual or apparent authority on the part of the general contractor to bind the vessel to a specific subcontractor, the subcontractor cannot show that it provided necessaries on the order of the owner or its agent." *O'Rourke Marine Services, supra,* at *4; *see also Lake*

6

*Charles Stevedores, Inc., supra,* 199 F.3d at 229 ("Under the general contractor line, the general contractor supplying necessaries on the order of an entity with authority to bind the vessel has a maritime lien. However, subcontractors hired by those general contractors are generally not entitled to assert a lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." (internal citations omitted)). No evidence was offered in the trial of this matter establishing that Technip "directed" Radcliff to be its physical supplier of the bunker stem or was in any manner involved in the selection of Radcliff as physical supplier of fuel. Instead, the evidence is clear that Technip awarded the fuel supply contract to OW Bunkers UK for provision of the bunkers—without any knowledge that Radcliff's "dealings" with OW Bunker USA informed the price quoted to the vessel owner by OW Bunkers UK—and only learned that Radcliff would be the physical supplier of the fuel stem one hour ***after*** the contract award to OW Bunkers UK. Such after-acquired knowledge of Radcliff's involvement, however, is insufficient to give rise to a maritime lien, *see, e.g., Galehead, supra,* 183 F.3d at 1246 ("That a charterer of a vessel becomes aware that some work performed was by a party somewhere down the chain of contracting and re-contracting does not give rise to a maritime lien."); *Port of Portland v. M/V Paralla,* 892 F.2d 825, 828 (9th Cir. 1989) ("Here the Port dealt with Northwest and not with Automar or Automar's managing agent. It cannot be denied that Automar knew that Northwest was using the Port's facilities, but that has never been held to be sufficient to establish a lien. . . . The Port points out that an owner can still become responsible for the services of a subcontractor, if the owner has ordered the general contractor to retain that subcontractor. We do not deny that possibility. It is indicated by *Farwest* itself. It is also suggested by *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 859 F.2d at 1409, although in that case the connection is a bit more attenuated. Unfortunately for it, the Port's evidence in this respect was quite deficient, and the district court did not err when it determined that no such authority existed. The most the Port has shown is the fact that it was most likely, even perhaps rather certain, that Northwest would choose the facilities of the Port when it did its work. That alone does not constitute a direction or requirement to use those services."); *Valero Marketing & Supply Co. v. M/V Almi Sun, IMO No. 9579535,* 160 F.Supp.3d 973, 983 (E.D. La. 2016) ("[M]erely knowing that a subcontractor would be used, or even that a particular supplier would most likely be used, to ultimately furnish necessaries, does not necessarily create a maritime lien[.]"), and because Radcliff otherwise has failed to demonstrate that  it provided necessaries to the DEEP BLUE, on November 1, 2014, "on the order of the owner or a person authorized by the owner[,]" 46 U.S.C. § 31342(a), it has no lien against the DEEP BLUE for the value of the fuel delivered.

However, Radcliff is not finished inasmuch as its "fallback"

argument is that, notwithstanding the relationship between it and Technip, the continued actions of the DEEP BLUE's chief engineer in coordinating the delivery of the fuel stem, accepting the fuel onboard, and signing the bunker certificate constitutes ratification sufficient to create a maritime lien, inasmuch as the Chief Engineering Officer of a vessel is a position that has been deemed to be entrusted with the management and operation of the vessel and presumed to have authority to procure or ratify necessaries pursuant to 46 U.S.C. § 31341 (*see* T.T. 221-223), *compare e.g., Noramco Shipping Corp. v. Bunkers Int'l Corp.*, 2003 WL 22594419, *8 (M.D. Fla. Apr. 30, 2003) ("A subcontractor or third-party can assert a maritime lien against the owner for necessaries provided to the vessel . . . if a person authorized to procure necessaries for a vessel approves the subcontractor's services.") *with Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 202 (5th Cir. 1979) ("Authorization, actual and fairly presumed, given prior to or during rendition of services, or ratified subsequent to rendition will suffice."), and Technip has not rebutted the statutory presumption with advance notice to Radcliff that the Chief Engineer lacked authority to order such services, *compare Belcher Co. of Alabama, Inc. v. M/V Maratha Mariner*, 724 F.2d 1161, 1163 (5th Cir. 1984) ("This lien attaches when necessaries are ordered by and supplied to a charterer, unless the supplier has notice that the person **who orders** the necessaries lacked authority to do so." (emphasis supplied)) *with Ferromet Resources, Inc. v. ChemOil Corp.*, 5 F.3d 902, 904 (5th Cir. 1993) ("The ship's master or other person, such as a charterer, to whom the vessel is entrusted is presumed to have authority **to purchase necessaries** to the credit of the vessel. The materialman who furnishes necessaries in response to a request from a master, charterer or other person in custody of the vessel has no duty to inquire about that person's authority to bind the vessel. But the supplier's lien is defeated if he has actual knowledge that **the person ordering the necessaries** has no authority to bind the vessel." (emphasis supplied)).

Unfortunately, however, Radcliff's "fallback" argument also fails for the simple fact that the Chief Engineer in this case did not "himself" order or purchase the fuel bunkers; instead, he can only be regarded as having "initiated" the process and then, upon the fuel contract being awarded to OW Bunkers UK, the Chief Engineer "coordinated" the delivery of the bunkers through emails to and from Radcliff's General Manager and then signed the Bunker Certificate, as required by MARPOL, acknowledging receipt of the bunker fuel. Moreover, in "coordinating" the delivery of the fuel stem, Radcliff's general manager admitted that the "logistical" emails did not constitute some type of contract negotiation, and courts have held that such coordination and acceptance does not rise to the level of ratification. *Compare Lake Charles, supra*, 199 F.3d at 231 & 232 ("LCS argues that the actions on the part of the master of the Vessel operated to ratify its providing stevedoring services and thereby to bind

the Vessel. A large portion of its ratification argument rests on the absence of any objection on the part of the Vessel's agents to LCS boarding the Vessel, and on its contention that the Vessel's awareness that LCS was supplying the necessaries is sufficient under the MCILA to constitute authorization. . . . Much of this evidence reduces to a showing that the master of the Vessel allowed LCS on board to perform stevedoring services and accepted those services. Under the contract between Man Sugar and Broussard, Broussard was obligated to deliver the rice free-on-board the Vessel. Had the Vessel's agents not allowed the stevedores to load the rice, they would have prevented Broussard from fulfilling its contractual obligations. Under these circumstances, we are hesitant to declare that the Vessel's agents subjected the *res* to liability for stevedoring services necessary to enable Broussard to deliver the rice as per its agreement with Man Sugar. As the district court noted, awareness on the part of the Vessel's agents that LCS was apparently the firm chosen by Broussard to load the rice is insufficient under the MCILA to constitute authorization. . . . A holding that awareness that necessaries are being supplied was sufficient, even though those necessaries were procured by an entity without authority to bind the vessel, would render the statute's authority requirement meaningless. We must also reject LCS' contention that acceptance of LCS' services and the rice aboard ship provided the necessary authorization to entitle it to a lien. It is a settled principle of contract law that a contract requiring A to supply X to C is satisfied if B, hired by A, provides X to C. . . . Under the circumstances here, the delivery of the rice, though performed by LCS, is attributed to Broussard. Acceptance of the rice on the part of the Vessel, through signing of Activity Sheets and the Mate's Receipt, was therefore acceptance of Broussard's rice and Broussard's delivery of that rice. . . . As a result, we do not view the activities on the part of the Vessel's master and crew to constitute ratification.") *with Valero Marketing & Supply Co., supra,* 160 F.Supp.3d at 985 ("[T]he fact that the Vessel's captain was forewarned by Almi Tankers that the Vessel would be receiving bunkers from Valero and given instructions to coordinate with Valero . . . [does not] amount[] to ratification of a maritime lien against the Vessel."). And, finally, the fact that the chief engineer signed a bunker delivery receipt which contained "lien" language on the front (the "No disclaimer stamp . . ." language) and terms and conditions on the back also containing additional "lien" language does not amount to ratification of a maritime lien because maritime liens are not creatures of contract—but of law—and "[t]he mere signature of a receipt alleging the existence of a lien cannot create such a lien if the statutory requirements for the lien are not met[,]" *O'Rourke Marine Services, supra,* at *4; *see* Doc. 92, Exhibit 2, *Aegean Bunkering (USA) LLC v. M/V AMAZON,* 14-cv-9447, *22 (S.D. N.Y. Aug. 24, 2016) ("[T]he delivery receipt argument is a red herring. The argument amounts to nothing more than an attempt to create a maritime lien by contract – something the law does not allow."); *Valero Marketing & Supply Co., supra,*

at *12 ("[N]either the Bunker Contract nor the Bunkering Certificate, nor the Vessel's acceptance of Valero's bunkers, could create a maritime lien where, as here, Valero has failed to point to evidence that the Vessel's owners directed the selection of Valero or otherwise retained sufficient control over the subcontractor's performance such that the Vessel became subject to a maritime lien held by Valero."), particularly where, as here, the chief engineer was required by MARPOL to sign the bunker receipt acknowledging delivery of the bunkers.

In light of the foregoing, the Court finds that although Radcliff provided necessaries to the DEEP BLUE on November 1, 2014, it has failed to establish that its provision of bunker fuel was on the order of the owner or a person authorized by the owner, as required by the statute, 46 U.S.C. § 31342(a); therefore, Radcliff holds no maritime lien.

**B.     Does  ING have a maritime lien on the DEEP BLUE under the CIMLA, as assignee of all rights, title and interest in and to the supply receivables of OW Bunkers UK?**  Before addressing the question of whether or not the aforementioned Omnibus Security Agreement creates an enforceable lien right, the Court need consider plaintiff's argument that OW Bunkers UK has no maritime lien because it (Radcliff) was not paid for the fuel it delivered to the DEEP BLUE. (*See generally* T.T. 225-227.) "The case law is that they would have a maritime lien without providing necessaries so long as they paid . . . their local supplier." (*Id.* at 226; *see also id.* ("They ordered the fuel and didn't pay the local supplier for that fuel. So you can't furnish fuel without paying for the fuel. They've never paid us. So they are not subrogated.").)

With this argument, plaintiff takes direct aim at the first element necessary to obtain a maritime lien, that is, the provision of necessaries. *See Galehead, supra,* 183 F.3d at 1244.  Plaintiff concedes that "a party need not be the physical supplier or deliverer to have 'provided' necessaries under the statute[,]" *Galehead, supra,* 183 F.3d at 1245, but contends that this is true only when the physical supplier of fuel has itself been paid for the fuel (*see* T.T. 226). *See Galehead,* 183 F.3d at 1244 (physical suppliers paid); *A/S Dan-Bunkering Ltd. v. M/V Zamet,* 945 F.Supp. 1576, 1578 (S.D. Ga. 1996) (physical supplier paid); *Wilhelmsen Premier Marine Fuels AS v. UBS Provedores Pty Ltd.,* 519 F.Supp.2d 399, 402 (S.D. N.Y. 2007) (physical supplier paid); *Noramco, supra,* at *2 (physical supplier paid); *Exxon Corp. v. Central GulfLines Inc.,* 780 F.Supp. 191, 192 (S.D. N.Y. 1991) (physical supplier paid).

This Court, however, cannot agree with plaintiff's argument in this regard inasmuch as the general rule recognized in *Galehead, supra,* 183 F.3d at 1245 ("[A] party need not be the physical supplier or deliverer to have 'provided' necessaries under the statute."), simply cannot be read as

adding the requirement that a physical supplier be paid first before a contract supplier is entitled to a lien, *see id.* Indeed, the undersigned concludes that OW Bunkers UK would have a maritime lien because it took the order from Technip (the owner of the vessel) and necessaries (fuel bunkers) were furnished to the DEEP BLUE. *See Galehead, supra,* 183 F.3d at 1244 & 1245; *compare id. with O'Rourke Marine Services, supra,* at *5 ("[T]he party contractually obligated to supply fuel to a vessel is entitled to a maritime lien, despite the fact that it caused another supplier to actually deliver the ordered fuel to the vessel."). A subrogation situation simply does not exist in this case, whereby OW Bunkers UK / ING would step into Radcliff's shoes after paying the physical supplier, because, as reflected above, plaintiff does not have any lien rights which may be subrogated.

(Doc. 93, at 18-31 (footnotes omitted).)

With the above-referenced Southern District of New York decisions relied upon by the Court being safely "ensconced" in its September 28, 2016 decision, the undersigned now focuses upon the relevant arguments offered by plaintiff in support of its Rule 59 motion.

On October 21, 2016, Judge Forrest issued an opinion in the *M/V TEMARA* case that held that the OW Bunker entities did not possess an enforceable maritime lien because the OW entities did not take on any risk in connection with providing necessaries and they did not physically supply any of the bunkers. *See* **Exhibit 1**, the *M/V TEMARA* Opinion and Order dated October 21, 2016. "At no time did [OW Bunker] take on any risk (financially or in goods provided) with regard to the provision of bunkers to the [vessel]. It never assumed title or possession of the bunkers, it never obligated itself to pay the actual physical supplier, and it never supplied the bunkers. At most, OW Bunker's risk was a theoretical risk of a failure to deliver on its contract to the charterer; no exposure from this risk ever materialized." Thus, because the OW entities did not have a maritime lien, the court held that ING in turn did not receive a maritime lien by assignment. In addition to ruling against ING Bank in the *M/V TEMARA* case, the ruling applied directly to four other vessel arrest cases, *ING Bank v. M/V VOGE FIESTA,* 16-cv-2051, *ING Bank v. M/V OCEAN HARMONY,* 16-cv-2923, *ING Bank v. M/V MARITIME KING,* 16-cv-3456, and *ING Bank v. M/V JAWOR,* 16-cv-6453. The court entered judgment on behalf of the defendants in each case.

Furthermore, on the same day, Judge Forrest then entered summary judgment against ING Bank in the other two cases cited by this

Court and ING Bank, *Aegean Bunkering (USA) LLC v. M/T Amazon,* No. 14-cv-9447, and *O'Rourke Marine Services, LP v. M/V COSCO HAIFA*, 15-cv-2992. In each matter Judge Forrest entered a docket citation as to her ruling and cited her opinion in *M/V TEMARA*.

The *M/V TEMARA* persuasively mirrors Barcliff's contention that neither OW Bunker UK Ltd. nor OW Bunker USA, Inc., "provided" any necessaries to the vessel DEEP BLUE as they neither made the delivery themselves nor have they paid Barcliff for the delivery, and therefore neither they, nor their alleged assignees ING Bank, become subrogated to "step into the shoes" of Barcliff to assert a maritime lien. *See Cantieri Navali Riuniti v. M/V SKYPTRON*, 802 F.2d 160, 164 (5th Cir. 1986) (upon payment to the physical supplier for the necessaries it furnished, the equitable "doctrine of subrogation" provides that the seller "steps into the shoes" of the local supplier). ING Bank thus fails to meet the elements for a maritime lien pursuant to 46 USCA § 31342.

4.     Barcliff respectfully submits that the Court's interpretation of the CIMLA is inconsistent with the plain language and purpose of the statute. The lien statute is simple and straightforward, "a person providing necessaries to a vessel on the order of the owner or a person authorized by an owner . . . has a maritime lien on the vessel." 46 U.S.C. § 31342. The statute does not require that the physical supplier of necessaries have a contract directly with the owner, or that the owner order the necessaries directly from a nominated or designated physical supplier. It is precisely because the physical supplier usually has no direct (or third-party beneficiary) contractual claims with the owner that the statute grants the physical supplier a maritime lien against the vessel.

The CIMLA exists to protect American suppliers and expedite lien recognition. *Gulf Trading and Transp. Co. v. The Vessel HOEGH SHIELD,* 658 F.2d 363, 367-8 (5th Cir. 1981). The statute was amended in 1971 to eliminate the supplier's duty to investigate a party's authority to incur a lien and to replace it with a statutory presumption of authority. *See Hinson v. M/V CHIMERA,* 661 F.Supp.2d 614, 615 (E.D. La. 2009) ("Significantly, a 1971 statutory amendment removed a 'duty of reasonable inquiry' as to the procurer's authority that the statute previously imposed on the supplier of necessaries. Thus, the statutory presumptions of authority set forth in § 31341 apply *unless* rebutted by a showing that the supplier of necessaries had actual knowledge that the procurer in fact lacked authority.") (citing *Gulf Oil Trading Co. v. M/V Caribe Mar,* 757 F.2d 743, 746-49 (5th Cir. 1985) (discussing amendment)). "Congress was concerned that the duty of inquiry had become a 'substantial obstacle' for persons furnishing supplies." *Marine Fuel Supply & Towing v. M/V KEN LUCKY,* 869 F.2d 473, 478 (9th Cir. 1988).

Barcliff submits the effect of the ruling in this case is to establish a duty of inquiry, requiring the physical supplier to analyze the chain of contracts between it and the vessel interests even where, as here, there is no question that the party who actually originated the order was fully authorized to do so and the physical supplier was fully authorized by that order to provide the necessaries. *See Wrist Worldwide Trading GmbH v. M/V AUTO ATLAS*, 2011 WL 2634848, *4, n.18 (D. Md. 2011) (noting that the *Ken Lucky* court, "refus[ed] to burden the fuel supplier with the 'onerous duty of resolving the ambiguities in the bunker broker financier-subcharterer-managing agent-bunker broker relationship'").

The DEEP BLUE needed fuel and bunkers were ordered on behalf of the vessel owner, Technip, at its behest, which Barcliff provided in exact quantity and quality. There is no question the vessel owner's procurement team in Aberdeen Scotland knew in advance of the bunkering that Barcliff would be providing the bunkers. There is no question that Barcliff was authorized to provide the fuel to the DEEP BLUE: it was authorized to attach the hose directly to the vessel and unload bunkers into its tank. It took coordination and effort between the vessel and the supplier to deliver, sample, and accept the bunkers. Despite the clear authorization given to Barcliff to supply the vessel, the concomitant obligation to pay for the necessaries has been split from the act of delivering the product under an overly narrow interpretation of the CIMLA. Under the plain language of the lien statute, Barcliff provided necessaries on the order of the owner or a person authorized by the owner, and it has a maritime lien on the vessel. 46 U.S.C. § 31342.

WHEREFORE, Plaintiff Barcliff, LLC, respectfully prays for entry of Judgment Pursuant to Rule 59 in favor of Barcliff LLC and denying the claims of ING Bank, or that the existing judgment be altered or amended to reflect the above relief sought, and that this Court grants to Plaintiff each other and further relief to which it may show itself to be justly entitled, these premises considered.

(Doc. 97, at 2-5.)

In its reply to the responses in opposition, Radcliff initially (and even later) posits that its motion for reconsideration is founded on this Court's putative manifest errors of law (Doc. 101, at 1 (noting that reconsideration "is appropriate to correct manifest errors of law or fact[]"); *see also id.* at 8 ("Barcliff respectfully submits that the application of the CIMLA in such a restrictive manner as to hold that Barcliff did not provide[] necessaries

on the order of the owner or a person authorized by the owner, under the facts of this case, is clear error or manifest injustice under FRCP 59(e).")), with respect to its conclusions that Radcliff failed to prove that it had a maritime lien on the M/V DEEP BLUE but that ING Bank did have a maritime lien on the vessel, as assignee of all rights, title and interest in and to the supply receivables of OW Bunkers UK (*see id.*); however, in discussing this Court's legal decision regarding ING Bank's maritime lien, Radcliff "blurs" the line in arguing that a "later" decision in *Temara* that ING Bank did not have a maritime lien under the CIMLA, "is tantamount to an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice." (Doc. 101, at 4.)

## CONCLUSIONS OF LAW

**A.**   **Rule 59(a)**.  Rule 59(a) provides, in relevant measure, that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed.R.Civ.P. 59(a)(1)(B); *see also* Fed.R.Civ.P. 59(a)(2) ("After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment."). Courts have recognized three grounds for granting a new trial following a bench trial:  "(1) manifest error of law; (2) manifest error of fact; and (3) newly discovered evidence." *Brown v. Wright,* 588 F.2d 708, 710 (9th Cir. 1978) (citation omitted); *see also Radiofone, Inc. v. Pricellular Corp.,* 1993 WL 192202, *4 (E.D. La. May 28, 1993) ("Federal Rule of Civil Procedure 59(a) provides that 'a new trial may be granted to all or any of the parties and on all or part of the issues

. . . in an action tried without a jury, for any of the reasons for which rehearings have

heretofore been granted in suits in equity in the courts of the United States.' Those

reasons are limited to: (1) manifest error of law; (2) manifest error of fact; and (3) newly

discovered evidence.").

In this matter, while plaintiff "styled" the instant pleading in an alternative

manner, as a motion for new trial *or* to alter or amend the judgment (Doc. 97, at 1),

nothing about the relief requested by Radcliff would necessitate a rehearing and the

taking of additional testimony (*see id.* at 5 ("Under the plain language of the lien statute,

Barcliff provided necessaries on the order of the owner or a person authorized by the

owner, and it has a maritime lien on the vessel. 46 U.S.C. § 31342. WHEREFORE,

Plaintiff Barcliff, LLC, respectfully prays for entry of Judgment Pursuant to Rule 59 in

favor of Barcliff LLC and denying the claims of ING Bank, or that the existing judgment

be altered or amended to reflect the above relief sought[.]"); *compare id. with* Doc. 101, at

8 (same)). Therefore, the undersigned questions whether plaintiff has properly

"invoked" Rule 59(a), as opposed to simply Rule 59(e). (*See id.*) Nevertheless, to the

extent plaintiff indeed intended to alternatively seek a new trial, such request could only

be based on a "manifest error of law" inasmuch as Radcliff offers no newly discovered

evidence and points to no manifest error of fact. And since plaintiff would likewise have

to establish a manifest error of law to be entitled to relief in accordance with Rule 59(e),

the Court's remaining focus will be directed to Rule 59(e).

**B.** **Rule 59(e)**.  Rule 59(e) simply provides that "[a] motion to alter or amend a

judgment must be filed no later than 28 days after the entry of the judgment."

Fed.R.Civ.P. 59(e). Courts have recognized three grounds that justify altering or

amending a judgment:  (1) an intervening change in controlling law; (2) the availability

of new evidence; and (3) the need to correct clear error or manifest injustice. *Wendy's*

*Int'l, Inc. v. Nu-Cape Constr., Inc.,* 169 F.R.D. 680, 686 (M.D. Fla. 1996); *see also Summit*

*Medical Center of Alabama, Inc. v. Riley,* 284 F.Supp.2d 1350, 1355 (M.D. Ala. 2003) ("A

motion to reconsider[5] is only available when a party presents the court with evidence of

an intervening change in controlling law, the availability of new evidence, or the need to

correct clear error or manifest injustice." (footnote added)); *cf. United States v. Marion,* 562

F.3d 1330, 1335 (11th Cir.) ("The only grounds for granting [a Rule 59] motion are newly-

discovered evidence or manifest errors of law or fact." (internal quotation marks and

citation omitted)), *cert. denied sub nom. Gray v. United States,* 558 U.S. 930, 130 S.Ct. 347,

175 L.Ed.2d 229 (2009). The Supreme Court has made clear that a Rule 59(e) motion

"'may not be used to relitigate old matters, or to raise arguments or present evidence

that could have been raised prior to the entry of judgment.'" *Exxon Shipping Co. v. Baker,*

554 U.S. 471, 485 n.5, 128 S.Ct. 2605, 2617 n.5, 171 L.Ed.2d 570 (2008), quoting 11 C.

Wright & A. Miller, Federal Practice and Procedure § 2810.1, pp. 127-128 (2d ed. 1995);

*see also Richardson v. Johnson,* 598 F.3d 734, 740 (11th Cir. 2010) ("A motion for

reconsideration cannot be used 'to relitigate old matters, raise argument or present

evidence that could have been raised prior to the entry of judgment.'" (citation omitted));

*Mincey v. Head,* 206 F.3d 1106, 1137 n.69 (11th Cir. 2000) (finding that a motion to alter or

amend a judgment is not "a vehicle to relitigate old matters or present the case under a

new legal theory . . . [or] to give the moving party another 'bite at the apple' by

---

[5]       "A motion for reconsideration of a final judgment will generally be construed as a
motion under Federal Rule of Civil Procedure 59(e) to alter or amend the judgment if the motion
does not cite a specific federal rule." *Pennsylvania Ins. Guar. Ass'n v. Trabosh*, 812 F.Supp. 522, 524
(E.D. Pa. 1992).

permitting the arguing of issues and procedures that could and should have been raised prior to judgment." (internal quotation marks and citation omitted)), *cert. denied*, 532 U.S. 926, 121 S.Ct. 1369, 149 L.Ed.2d 297 (2001); *Gipson v. Mattox,* 511 F.Supp.2d 1182, 1185 (S.D. Ala. 2007) ("Nor may a party properly utilize a motion to reconsider as a vehicle for rehashing arguments considered and rejected in the underlying order."); *Wendy's Int'l, Inc., supra,* 169 F.R.D. at 686 ("[A motion to alter or amend judgment] is not a vehicle for rehashing arguments already rejected by the court or for refuting the court's prior decision."). Moreover, "it is well-settled that 'motions for reconsideration are disfavored' and that relief under Rule 59(e) is an extraordinary remedy to be employed sparingly." *Krstic v. Princess Cruise Lines, Ltd. (Corp),* 706 F.Supp.2d 1271, 1282 (S.D. Fla. 2010).[6] Indeed, because a motion to reconsider is not an appeal, "'it is an improper use of the motion to reconsider to ask the Court to rethink what the Court . . . already thought through—rightly or wrongly.'" *Krstic, supra,* 706 F.Supp.2d at 1282 (citation omitted); *cf. Deerskin Trading Post, Inc. v. United Parcel Serv. of America, Inc.,* 972 F.Supp. 665, 674 (N.D. Ga. 1997) ("'[A] motion for reconsideration is not an opportunity for the moving party and their counsel to instruct the court on how the court "could have done it better" the first time.'" (citation omitted)).

    With these general principles in mind, the Court considers Radcliff's Rule 59(e) motion to alter or amend the judgment. The undersigned notes that plaintiff did not specifically identify which of the three aforementioned grounds for altering or amending the judgment apply in this instance in its initial motion (*see* Doc. 97); instead, the Court

---

[6]     The Eleventh Circuit "will not overturn a denial of a Rule 59 motion absent an abuse of discretion." *Mays v. United States Postal Serv.,* 122 F.3d 43, 46 (11th Cir. 1997); *see also Mincey, supra,* 206 F.3d at 1137 ("The decision whether to alter or amend a judgment pursuant to Rule 59(e) is 'committed to the sound discretion of the district judge.'" (citation omitted)).

agrees with ING Bank that plaintiff's motion "gloss[ed] over the strict legal standard governing" Rule 59(e). *See Northstar Marine, Inc. v. Huffman,* 2014 WL 3894076, *2 (S.D. Ala. Aug. 8, 2014). Moreover, Radcliff's reply is not as helpful in this regard as the undersigned initially perceived (*see* Doc. 101, at 1 (noting that "reconsideration is appropriate to correct manifest errors of law or fact.")), inasmuch as plaintiff goes on to argue in reply that the *Temara* decision (at least that portion finding ING Bank did not possess a maritime lien under the CIMLA) is "tantamount to an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice." (*Id.* at 4.) Regardless of Radcliff's lack of clarity in this regard, the undersigned can dispatch of two of the three grounds quite easily because it strains commonsense, logic and reasoning that newly-discovered evidence can be case law (given the other two grounds available for altering or amending a judgment) and though Radcliff initially directs this Court to the October 21, 2016 opinion of District Judge Katherine Forrest in *ING Bank N.V. v. M/V Temara* (*see* Doc. 97, Exhibit 1), the *Temara* decision does not represent an "intervening change in controlling law." *See Lucas v. Molten, Allen & Williams,* 2016 WL 2754450, *2 n.2 (N.D. Ala. May 12, 2016) ("District court decisions . . . are not controlling authority."). Accordingly, the undersigned considers whether Radcliff has established any manifest error of law.

"Manifest error does not mean that one does not like the outcome of a case, or that one believes the court did not properly weigh the evidence. . . . Rather, manifest error is an error that is plain and indisputable, and that amounts to a complete disregard of the controlling law or the credible evidence in the record." *Daughtry v. Army Fleet Support, LLC,* 2014 WL 466100, *2 (M.D. Ala. Feb. 5, 2014) (internal quotation marks and

citations omitted); *see also Thomas v. Dolgencorp, LLC,* 2015 WL 4528232, *2 (M.D. Ala. Jul. 27, 2015) (same), *aff'd,* 645 Fed.Appx. 948 (11th Cir. Mar. 15, 2016). Stated somewhat differently, what is ordinarily required is "a showing 'of "clear and obvious error" where the "interests of justice" demand correction.'" *McGuire v. Ryland Group, Inc.,* 497 F.Supp.2d 1356, 1358 (M.D. Fla. 2007), quoting *Prudential Securities, Inc. v. Emerson,* 919 F.Supp. 415, 417 (M.D. Fla. 1996), in turn quoting *American Home Assurance Co. v. Glenn Estess & Assocs., Inc.,* 763 F.2d 1237, 1239 (11th Cir. 1985). "An error is not 'clear and obvious' if the legal issues are 'at least arguable.'" *United States v. Battle,* 272 F.Supp.2d 1354, 1358 (N.D. Ga. 2003), quoting *American Home Assurance Co., supra,* 763 F.2d at 1239; *see also Robbins v. Scana Energy Marketing, Inc.,* 2008 WL 7724172, *1 (N.D. Ga. Jul. 30, 2008) ("An error is clear only when the legal issues are inarguable.").

To support its claim of clear error, Radcliff first argues that the recent decision issued by U.S. District Judge Katherine B. Forrest in the *M/V Temara* case undermines this Court's decision that the OW Bunker entities did not have to pay the physical supplier to meet the "providing" requirement (that is, the provision of necessaries requirement) under the CIMLA. (Doc. 97, at ¶ 3; *see also* Doc. 101, at 2 & 5.) This is so, plaintiff reasons, because this Court, in reaching this holding, relied upon a case as "additional authority" (*see id.*)—namely, *O'Rourke Marine Services, LP*[7]—which was directly impacted by Judge Forrest's decision in *Temara* that O.W. Bunker did not have a maritime lien because it took no risk in connection with providing necessaries,

_____

[7]     Although plaintiff seems to suggest that this Court also relied upon the *Temara* decision and the *Aegean Bunkering* decision "in reaching its decision in this matter that no party was required to pay the physical supplier to meet the "providing' requirement" under the CIMLA (Doc. 101, at 5), this is simply not true; instead, this Court relied solely on *O'Rourke* as supplemental authority in reaching this conclusion (*see* Doc. 93, at 31).

specifically, it did not physically supply the bunkers or pay any supplier that did. (*See* Doc. 97, at ¶ 3; Doc. 101, at 2 & 5.)[8] In addition, the second prong of Radcliff's two-headed argument is that this Court misinterpreted the CIMLA in denying its lien claim. (Doc. 97, at ¶ 4; Doc. 101, at 7-8.)

This undersigned finds, however, that in making these arguments, plaintiff seeks to rehash arguments previously rejected in the post-trial memorandum opinion and order, impermissibly seeks to instruct this Court on how it could have done it better the first time around, and/or has failed to establish an obvious error demanding correction. For instance, at trial Radcliff argued that neither OW Bunker entity provided any necessaries to the DEEP BLUE because neither delivered the bunker fuel to the vessel or paid plaintiff for delivery of the bunker stem (*see* T.T. 226 ("If they haven't paid us and they haven't furnished anything, they don't have a maritime lien.")), the same argument it makes now and upon which it urges this Court to follow the holding in *Temara* (Doc. 97, at ¶ 3; Doc. 101, at 2 & 5). Because this Court rejected Radcliff's argument in this regard in its memorandum opinion and order (*see* Doc. 93, at 30-31), and *Temara* is not controlling law, plaintiff's attempts to convince the Court to follow *Temara* can be regarded as nothing less than an impermissible request for this Court to rethink that which it has already thought through (rightly or wrongly). *Krstic, supra*, 706 F.Supp.2d at 1282. In other words, this is an argument properly raised on appeal,[9] not on motion to alter or amend the judgment.

---

[8]     Upon finding O.W. Bunker lacked a maritime lien, Judge Forrest denied ING's motions for summary judgment as to a maritime lien. (*See* Doc. 97, ¶ 3.)

[9]     This is particularly so given that a mere week ago, in *O'Rourke, supra*, judgment was entered in ING Bank's favor to the tune of $253,519.92. (Doc. 102, Exhibit 1 to Exhibit A.)

Moreover, Radcliff contends that this Court's interpretation of the CIMLA, in denying its lien claim, is inconsistent with the plain language and purpose of the statute inasmuch as it establishes "a new duty of inquiry, requiring the physical supplier to analyze the chain of contracts between it and the vessel interests even where, as here, there is no question that the party who actually originated the order was fully authorized to do so and the physical supplier was fully authorized by that order to provide the necessaries." (Doc. 97, at 4.) The undersigned cannot agree with plaintiff that the portion of the memorandum opinion and order directed to whether Radcliff had satisfied its burden of proving that it held a valid maritime lien—more specifically, that it failed to prove that the bunker stem was supplied on the order of the owner or a person authorized by the owner (*see* Doc. 93, at 18-30)—placed "a new duty of inquiry" upon suppliers; instead, as Technip points out in its brief, this Court merely required proof of authority, as required by the statute, "not a duty to inquire whether such authority exists." (Doc. 99, at 5.) And since plaintiff has not set forth law of a strongly convincing nature that the effect of this Court's decision was to create a new duty of inquiry into authority, *cf. Robbins, supra,* at *1 ("An error is clear only when the legal issues are inarguable."), this Court declines Radcliff's invitation to resort to the extraordinary remedy of reconsideration to upend its entire analysis (Doc. 93, at 18-30) and reverse course by finding that plaintiff has a maritime lien on the DEEP BLUE.[10] Again, this is an appellate issue particularly where, as here, this Court's denial of a maritime lien to the physical supplier (Radcliff) is consistent with a plethora of decisions

---

[10]       This Court **ADOPTS** as it own analysis, as if fully set forth herein, that portion of ING Bank's brief directed to the "merits" of Radcliff's Rule 59(e) motion (*see* Doc. 100, at 10-19).

(including *O'Rourke*[11]) by district courts across the country denying similar maritime lien claims by physical suppliers arising out of the collapse of the OW Bunker entities. (*See* Doc. 99, at 1-2 & n.2 (collecting cases).)[12]

## CONCLUSION

For the foregoing reasons, plaintiff's Rule 59 motion for new trial or to alter or amend judgment (Doc. 97) is **DENIED**.

**DONE** and **ORDERED** this the 20th day of December, 2016.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

[11]     As previously noted, the *O'Rourke* decision relied upon by this Court was authored by Judge Scheindlin. *See* n.4, *supra*. That case was later assigned to Judge Forrest following Judge Scheindlin's retirement. (Doc. 102, Exhibit A, at 2.) As reflected in this Court's memorandum opinion and order, Judge Scheindlin determined that O'Rourke, the physical supplier, failed to demonstrate that it was entitled to a maritime lien under the CIMLA because of deficient proof with respect to the crucial third element (*see generally* Doc. 93, at 22-29), a determination that was upheld by Judge Forrest on reconsideration (Doc. 102, Exhibit A, at 2). Ultimately, summary judgment was entered against O'Rourke on November 3, 2016 (Doc. 101, Exhibit B, Doc. 125), and final judgment was entered by agreement in *O'Rourke* in favor of ING Bank on December 13, 2016 (Doc. 102, Exhibit 1 to Exhibit A ("For the reasons set forth in the Stipulation of ING and Cosco . . ., judgment is hereby entered in ING's favor in the total amount of $253,519.92 with interest to run per the Settlement Agreement between ING Bank N.V. and the Cosco parties.")).

[12]     "The provision of necessaries does not always give rise to a maritime lien. . . . [A]s the litigants before this Court have themselves witnessed in their own cases, a physical supplier who does not provide necessaries 'on the order of' the owner or one authorized by the owner, lacks a maritime lien. ING Bank N.V. v. M/V Temara, No. 16-cv-95, 2016 WL 4471901 (S.D.N.Y. Aug. 24, 2016); Aegean Bunkering (USA) LLC v. M/T Amazon, No. 14-cv-9447, 2016 WL 4471895 (S.D.N.Y. Aug. 24, 2016). Because of 'the Second Circuit's current commitment to a stricti juris approach to maritime liens,' even entities that have suffered a loss by providing uncompensated necessaries to a vessel are not entitled to a lien unless they meet the precise statutory requirements of CIMLA. Integral Control Sys. Corp. v. Consolidated Edison Co., 990 F.Supp. 295, 301 (S.D.N.Y. 1988)." (Doc. 97, Exhibit 1, at 18-19.)